*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0031p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

JEFFREY A. WOGENSTAHL,
    *Petitioner-Appellant,*

  *v.*

BETTY MITCHELL, Warden,
    *Respondent-Appellee.*

No. 07-4285

—————————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00843—Thomas M. Rose, District Judge.

Argued: August 3, 2010

Decided and Filed: February 2, 2012

Before: MOORE, GIBBONS, and McKEAGUE, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Andrew P. Avellano, Columbus, Ohio, for Appellant. Justin M. Lovett, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Andrew P. Avellano, Columbus, Ohio, Gregory W. Meyers, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Justin M. Lovett, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

  GIBBONS, J., delivered the opinion of the court, in which McKEAGUE, J., joined. MOORE, J. (pp. 48–49), delivered a separate opinion concurring in the judgment.

—————————————

## OPINION

—————————————

  JULIA SMITH GIBBONS, Circuit Judge. Petitioner–appellant Jeffrey A. Wogenstahl appeals the district court's order denying his 28 U.S.C. § 2254 petition for writ of *habeas corpus* seeking relief from both his conviction for aggravated murder with

1

death specifications and his resulting death sentence.  For the following reasons, we affirm the district court and deny Wogenstahl's petition.

I.

The facts underlying Wogenstahl's *habeas* case, as determined by the Ohio Supreme Court, are as follows:

> Peggy Garrett was first introduced to Jeffrey A. Wogenstahl, appellant, in October 1991.  During October and November 1991, [Wogenstahl] and Peggy became casual acquaintances.  At the time, Peggy resided in a two-bedroom apartment at 301 Harrison Avenue, Harrison, Ohio, with her five children: Eric Horn, age sixteen, Justin Horn, age fifteen, Amber Garrett, age ten, Matthew Garrett, age eight, and Shayna Perkins, age four.  During October and November 1991, [Wogenstahl] visited the apartment on several occasions and came to know Peggy's family.
>
> [Wogenstahl] went to Peggy's apartment on Saturday afternoon, November 23, 1991.  He asked Peggy if she had any plans for the evening.  Peggy told [Wogenstahl] that she had no plans, and [Wogenstahl] left following a brief conversation.  That night, Peggy put her three youngest children (Amber, Matthew and Shayna) to bed for the evening.  At approximately 10:30 p.m., she decided to meet a friend, Lynn Williams, at a local bar.  Justin was spending the weekend at a friend's house. Peggy left sixteen-year-old Eric in charge of the other children.
>
> Peggy met Lynn Williams at the "Escape" bar sometime between 11:00 p.m. and midnight.  From there, the women drove Lynn's car to the Miamitown Lounge, which was also known as "Hornsby's."  At Hornsby's, Peggy and Lynn saw [Wogenstahl] at the bar. He was wearing a brown leather jacket and jeans.  [Wogenstahl] joined the women for drinks and conversation.  [Wogenstahl] asked Peggy where Justin was and what Eric and the other children were doing.  Peggy told [Wogenstahl] that Justin was away for the weekend, and that Eric was home baby-sitting the children.  At some point, the trio went outside to [Wogenstahl's] car to smoke marijuana.
>
> On Sunday morning, at approximately 2:15 a.m., [Wogenstahl], Peggy and Lynn drove Lynn's car to the Flicker Inn.  Later, the women drove [Wogenstahl] back to Hornsby's, where appellant's car was parked.  [Wogenstahl] invited the women to his apartment to smoke marijuana, but Peggy and Lynn told [Wogenstahl] that they were going to the Waffle House restaurant.  Peggy and Lynn then separated from [Wogenstahl] and drove directly to the Waffle House.  After the women had arrived at the restaurant, a witness saw a car resembling

[Wogenstahl's] dark-brown four-door 1978 Oldsmobile Omega pull into and then out of the restaurant parking lot.

At approximately 3:00 a.m., while the women were at the Waffle House, [Wogenstahl] drove to Peggy's apartment and spoke with Eric. According to Eric, [Wogenstahl] claimed that Peggy needed to see him (Eric) at Troy Beard's house. Beard was Peggy's friend who lived approximately three blocks from the apartment. Eric locked the door to the apartment, leaving the children unattended, and drove with [Wogenstahl] to the vicinity of Beard's residence. [Wogenstahl] dropped Eric off approximately one block from Beard's apartment. According to Eric, [Wogenstahl] said that he would drive around the block and then pick Eric up to drive him home. When Eric arrived at the residence, Beard told Eric that he (Beard) had not seen Peggy at all that evening. Eric left Beard's apartment and waited for [Wogenstahl] to drive him home. [Wogenstahl] did not return. Eventually, Eric walked home and found that the door to the apartment was unlocked. He checked on the children and noticed that ten-year-old Amber was missing. However, Eric mistakenly assumed that Amber might have been spending the night at a friend's house. Thus, he mentioned nothing to Peggy when she returned home later that morning.

On the morning of November 24, 1991, Vickie Mozena was working at a United Dairy Farmers store in Harrison, Ohio, near the Ohio–Indiana border. At approximately 3:15 a.m., Mozena saw a car resembling [Wogenstahl's] Oldsmobile drive past the store in the direction of Bright, Indiana. Mozena observed the silhouette of a man driving the vehicle, and what appeared to be a young girl next to him in the passenger's seat. Between 3:45 and 4:00 a.m., Mozena saw the same vehicle parked at a car wash across the street from the United Dairy Farmers store. The vehicle pulled out of the car wash and into the farthest corner of the United Dairy Farmers parking lot. The driver did not exit the vehicle for several minutes, and Mozena thought that she was about to be robbed. However, [Wogenstahl] exited the vehicle, came into the store, and purchased a pack of cigarettes. At that time, Mozena noticed what appeared to be dirt or blood under [Wogenstahl's] fingernails. Later that morning, Mozena once again saw [Wogenstahl's] car parked across the street at the car wash. According to Mozena, there was a man inside the car, presumably cleaning the interior.

Harold Borgman lived on Jamison Road between Harrison, Ohio, and Bright, Indiana. Borgman's home was located in a rural area of West Harrison, Indiana, approximately four miles from Harrison. At 3:13 a.m. on the morning of November 24, 1991, Borgman got out of bed to use the bathroom. Sometime later, he looked out the window and saw a car driving very slowly on Jamison Road toward the direction of Harrison. The driver pulled off to the side of Jamison Road, stopped, and turned off

the headlights. Borgman continued to watch for several minutes, and observed two or three vehicles pass the parked car on Jamison Road.

On November 24, at approximately 3:40 a.m., Brian Noel was driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgmans residence, Noel saw a late 1970s-model, dark-colored four-door vehicle parked off to the side of Jamison Road, the vehicle facing the opposite direction. Noel came to a rolling stop alongside the vehicle and observed a man apparently retrieving something from the trunk of the automobile. The man was wearing a dark jacket and blue jeans. Noel later identified [Wogenstahl] as the man he had seen on Jamison Road in the early morning hours of November 24. He also identified [Wogenstahl's] 1978 Oldsmobile as the car that had been pulled off to the side of Jamison Road.

On November 24, at approximately 3:40 a.m., Kathy Roth was driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgman's residence, Roth saw a man wearing a brown leather jacket and blue jeans standing near a parked car off to the side of Jamison Road. As Roth drove past the vehicle, the man turned to face her, dropped his head, and then turned around to face the woods. Roth later identified [Wogenstahl] as the man she had seen on Jamison Road.

Frederick G. Harms was driving on Jamison Road on November 24, at approximately 3:40 a.m. Harms also saw the vehicle parked off to the side of Jamison Road. According to Harms, the vehicle resembled [Wogenstahl's] 1978 Oldsmobile Omega.

On Sunday afternoon, November 24, Peggy Garrett finally realized that Amber was missing. At that time, Eric told Peggy about [Wogenstahl's] 3:00 a.m. visit to the apartment. Peggy and others went to [Wogenstahl's] residence and knocked on the door for over an hour. When [Wogenstahl] finally answered, Peggy asked him why he had taken Eric to Troy Beard's apartment earlier that morning. [Wogenstahl] stated that he had been "messing with Eric's head," and claimed to have no knowledge of Amber's whereabouts. On the evening of November 24, 1991, [Wogenstahl] gave a similar statement to Officer Charles Lindsey of the Harrison Police Department.

On Monday, November 25, 1991, police executed a search warrant at [Wogenstahl's] residence. During the search, [Wogenstahl] was questioned concerning his movements on the morning of November 24. [Wogenstahl] admitted to having visited the Harrison Avenue apartment on November 24 at approximately 3:00 a.m. [Wogenstahl] told police that he had duped Eric out of the Harrison Avenue apartment as a practical joke. However, [Wogenstahl] stated that he went directly home to bed after having taken Eric to the vicinity of Troy Beard's apartment. Police then requested that [Wogenstahl] accompany them to the Harrison Police Department. [Wogenstahl] agreed to go to the police station and asked for his leather jacket. Officer Lindsey retrieved the

jacket from the bedroom closet. Lindsey noticed that the jacket was soaking wet and that the lining was discolored. According to police, [Wogenstahl] explained that his cat had urinated on the jacket on *Friday* evening, November 22, 1991. [Wogenstahl] further explained that he had washed the jacket on Friday night. Police were suspicious, since [Wogenstahl] had worn the jacket on Saturday night, November 23, 1991.

Police found several bloodstains in [Wogenstahl's] bathroom. However, it could not be determined whether the blood was human blood. The items seized from [Wogenstahl's] residence included drugs and drug paraphernalia. Police contacted [Wogenstahl's] parole officer, and a parole holder was placed against [Wogenstahl]. On November 25, 1991, police also attempted to search a dumpster near [Wogenstahl's] apartment. However, the dumpster had been emptied earlier that morning. Two witnesses had seen [Wogenstahl] near the dumpster on November 24, at approximately 5:15 a.m.

On the morning of November 27, 1991, [Wogenstahl] made another statement to law enforcement authorities. This time, [Wogenstahl] claimed that he had driven Eric to the vicinity of Troy Beard's apartment on November 24 because Eric had wanted to deliver marijuana to Peggy. [Wogenstahl] once again asserted that he had proceeded directly home to sleep after dropping Eric off in the vicinity of Beard's residence.

Meanwhile, the search for Amber Garrett continued. On November 27, 1991, Harold Borgman reported to police that he had seen a suspicious vehicle on Jamison Road in the early morning hours of November 24. Borgman led police to the location near his house where he had seen the suspicious vehicle. Sergeant Kenneth J. Greves of the Indiana State Police searched the area and discovered Amber's partially frozen body down a steep embankment off to the side of Jamison Road.

The location where Amber's body was discovered was heavily wooded and overgrown with thorny bushes and vegetation. Amber was wearing a dress and a pair of panties. Her dress had been rolled up from behind and pulled down over her arms. She had been stabbed approximately eleven times, mostly in the chest and neck. Additionally, she had been repeatedly struck in the head with a blunt instrument. The blunt force injuries were consistent with having been caused by an automobile jack handle or some other blunt stick or rod. Superficial wounds on the body indicated that a knife had been held to the base of Amber's neck. The body was covered with postmortem scratches that had apparently been caused by the vegetation in the area. The evidence at the scene indicated that the murder had occurred at a different location and that the killer had carried Amber's body through the dense vegetation.

William L. Dean, a criminalist in the Trace Evidence Section of the Hamilton County Coroner's Laboratory, examined the leather jacket that [Wogenstahl] had been wearing on the morning of Amber's abduction. Thorn tips or "prickles" were removed from small triangular tears in the jacket. Dean also examined a pair of [Wogenstahl's] shoes that were found to contain prickles and other plant material.

Douglas W. Deedrick, a special agent with the Federal Bureau of Investigation, compared the plant material recovered from [Wogenstahl's] jacket and shoes with known samples of vegetation collected from the area where the body was discovered. Deedrick found that the plant material from [Wogenstahl's] clothing was similar to the vegetation collected from the crime scene. Additionally, Dr. Robert D. Webster, a research botanist, concluded that there were no differences between the vegetation recovered from [Wogenstahl's] clothing and the type of vegetation in the area where the body was discovered.

Police found two car jacks in the trunk of [Wogenstahl's] Oldsmobile, a ratchet jack and a screw or "scissors" jack. The metal handle for the screw jack was missing. There were no identifiable fingerprints anywhere in the vehicle. The car was exceptionally clean, as if it had been thoroughly washed. However, criminalists in the Trace Evidence Section of the Hamilton County Coroner's Laboratory found a very small bloodstain in [Wogenstahl's] Oldsmobile. The specimen was sent to the Serological Research Institute in California for testing. DNA was extracted from the bloodstain and was tested using the HLA DQ (Haldo) Alpha genetic marker system. The HLA DQ Alpha classification of the blood removed from [Wogenstahl's] vehicle was consistent with the HLA DQ Alpha classification of a known sample of Amber's blood. According to Brian Wraxall, a forensic serologist, Amber's HLA DQ Alpha classification occurs in approximately 5.3 percent of the Caucasian population. The blood recovered from [Wogenstahl's] vehicle was not consistent with appellant's blood or blood samples taken from Eric and Justin Horn.

Special Agent Deedrick of the Federal Bureau of Investigation found a single pubic hair inside the crotch area of Amber's panties. Deedrick compared the pubic hair to known samples of pubic hair that had been combed and plucked from [Wogenstahl's] pubic region. According to Deedrick, [Wogenstahl] pubic hairs exhibited the same microscopic characteristics as the pubic hair recovered from the victim's panties. Deedrick testified to a reasonable degree of scientific certainty that the pubic hair recovered from the victim's underpants had come from [Wogenstahl]. Amber was prepubescent and, thus, the hair could not have come from her. Pubic hair samples taken from Peggy Garrett, Eric Horn and Justin Horn did not match the pubic hair recovered from Amber's panties.

[Wogenstahl] was indicted by the Hamilton County Grand Jury for the aggravated murder of Amber. Count One of the indictment charged [Wogenstahl] for the purposeful killing of Amber during the commission of an aggravated burglary and/or [kidnaping]. This count of the indictment carried three death penalty specifications. [Wogenstahl] was also indicted, in Counts Two and Three, for [kidnaping] and aggravated burglary, respectively, with a specification alleging that [Wogenstahl] had a prior (1985) aggravated felony conviction.

[Wogenstahl] was tried before a jury. Bruce Wheeler was the prosecution's final witness in the guilt/innocence phase of the trial. Wheeler and [Wogenstahl] had been fellow inmates in the same "pod" at the Hamilton County Justice Center. At trial, Wheeler testified that he had spoken with [Wogenstahl] on several occasions concerning [Wogenstahl's] involvement in the killing. According to Wheeler, [Wogenstahl] had said that there was very little evidence against him because he had been "too slick" and had "covered up" the evidence. Further, [Wogenstahl] allegedly admitted to Wheeler that he ([Wogenstahl]) had entered the Garrett apartment with a stolen key and had [kidnaped] Amber to have sex with her. Wheeler testified that [Wogenstahl] "said he stuck it in her but * * * [did not] ejaculate * * * so there would not be any evidence." Additionally, [Wogenstahl] told Wheeler that he had wanted to return Amber to the apartment because he thought he could get away with having removed her from the residence. However, someone was at the Garrett residence when [Wogenstahl] attempted to return Amber to her home. Thus, according to Wheeler, [Wogenstahl] said that he decided to have "sex" with Amber once again. Wheeler testified that [Wogenstahl] admitted stabbing Amber in the chest when she refused his further sexual advances. According to Wheeler, [Wogenstahl] admitted killing Amber, dumping the body, cleaning the car, and disposing of the evidence. [Wogenstahl] also told Wheeler that police had planted Amber's blood in his ([Wogenstahl]) car because appellant had "cleaned his car too well."

The defense presented several witnesses in the guilt phase of [Wogenstahl's] trial. [Wogenstahl] testified on his own behalf and, among other things, denied the charges against him.

The jury found [Wogenstahl] guilty of all charges and specifications alleged in the indictment. Following a mitigation hearing, the jury recommended that [Wogenstahl] be sentenced to death for the aggravated murder of Amber Garrett. The trial court accepted the jury's recommendation and imposed the sentence of death. The trial court also sentenced appellant for the [kidnaping] and aggravated burglary convictions.

*State v. Wogenstahl*, 662 N.E.2d 311, 314–18 (Ohio 1996) (footnote omitted).

On direct appeal, Wogenstahl, represented by new counsel, set forth thirty-five grounds for relief. The Ohio Court of Appeals affirmed Wogenstahl's conviction and sentence. *State v. Wogenstahl*, No. C-930222, 1994 WL 686898 (Ohio Ct. App. Nov. 30, 1994). Wogenstahl then appealed to the Ohio Supreme Court. In 1995, while Wogenstahl's direct appeal to the Ohio Supreme Court was pending, Wogenstahl filed a *pro se* motion under Ohio App. R. 26(B), *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992), to reopen his appeal in the Ohio Court of Appeals, seeking to argue that his appellate attorneys had performed ineffectively by failing to raise certain claims. *See State v. Wogenstahl*, 662 N.E.2d 16 (Ohio 1996). The Court of Appeals dismissed the motion for lack of jurisdiction, noting that his claims of ineffective assistance of appellate counsel ("IAAC") should be raised on direct appeal to the Ohio Supreme Court. Citing Ohio S. Ct. Prac. R. II(2)(D)(1), the Ohio Supreme Court affirmed, concluding that Wogenstahl's notice of appeal to the Ohio Supreme Court in his direct appeal had divested the Court of Appeals of jurisdiction to consider his motion to reopen. *Id.* at 17.[1]

In 1996, the Ohio Supreme Court affirmed the conviction and sentence, rejecting thirty-three grounds for relief. *State v. Wogenstahl*, 662 N.E.2d 311 (Ohio 1996). In this appeal, Wogenstahl was represented by one new attorney and one of the two attorneys who had been appointed for his appeal to the court of appeals.

Later in 1996, Wogenstahl filed a state petition for postconviction relief pursuant to Ohio Rev. Code § 2953.21, raising five grounds for relief. *See State v. Wogenstahl*, No. C-970238, 1998 WL 306561 (Ohio Ct. App. June 12, 1998). The trial court denied relief. On appeal, Wogenstahl raised four assignments of error, but the Ohio Court of Appeals affirmed, concluding that Wogenstahl's ineffective assistance of trial counsel (IATC) claims were barred by *res judicata* because he could have raised them on direct appeal. *Id.* at *2–3. The Ohio Supreme Court dismissed Wogenstahl's discretionary

---

[1]Rule II(2)(D)(1) was amended effective after the Ohio Supreme Court's decision. *See Wogenstahl*, 662 N.E.2d at 17 n.1.

appeal because it did not involve any substantial constitutional question. *State v. Wogenstahl*, 700 N.E.2d 332 (Ohio 1998) (table).

In 1998, Wogenstahl filed in the trial court a motion for leave to file a motion for a new trial, urging the court "to order newly available, 'significantly advanced' DNA testing" on the blood evidence from his car. *State v. Wogenstahl*, No. C-980175, 1999 WL 79052 (Ohio Ct. App. Feb. 19, 1999). The trial court denied the motion, and the court of appeals affirmed. *Id.* at *3–4. The Ohio Supreme Court dismissed Wogenstahl's discretionary appeal. *State v. Wogenstahl*, 710 N.E.2d 716 (Ohio 1999) (table).

Also in 1998, Wogenstahl filed in the Ohio Court of Appeals a *pro se* motion for leave to file a delayed application for Rule 26(B) reopening in the Court of Appeals, alleging IAAC claims. *See State v. Wogenstahl*, 700 N.E.2d 1254 (Ohio 1998). The Court of Appeals denied relief because Wogenstahl failed to show good cause for filing his application more than two years after Ohio S. Ct. Prac. R. II(2)(D)(1) was amended to provide that courts of appeals retained jurisdiction to rule on a Rule 26(B) application to reopen while a direct appeal was pending before the Ohio Supreme Court. *Id.* at 1255. The Ohio Supreme Court affirmed, concluding that Wogenstahl had not shown good cause for the delay and that the Supreme Court had already rejected his IAAC claims on direct appeal. *Id.* at 1255–56.

Wogenstahl filed his § 2254 petition for writ of *habeas corpus* in 1999, and he amended his petition in 2003 to set forth twenty-eight claims for relief, some of which included multiple subclaims. After filing his § 2254 petition, Wogenstahl obtained information that the prosecution had withheld evidence that, prior to the 1993 trial, Eric Horn had been adjudicated delinquent for marijuana trafficking, contradicting his trial testimony that he never sold drugs. *See State v. Wogenstahl*, No. --- N.E.2d --- , C-039045, 2004 WL 2567655, at *3 (Ohio Ct. App. Nov 12, 2004). In 2003, the federal district court held the § 2254 proceeding in abeyance so that Wogenstahl could exhaust this new *Brady* claim in state court. *See id.* The Ohio trial court denied his motion for

a new trial. *See id.* The Ohio Court of Appeals affirmed. *See id.* at \*8. The Ohio Supreme Court declined to accept Wogenstahl's appeal.

Wogenstahl's *habeas* petition again proceeded. In 2007, a magistrate judge issued a report and recommendation ("R&R") recommending dismissal of Wogenstahl's petition for writ of *habeas corpus*. The district court adopted the magistrate's R&R in its entirety, concluding that Wogenstahl's claims were without merit or procedurally defaulted, or both, and dismissed the petition. *Wogenstahl v. Mitchell*, No. 1:99-cv-843, 2007 WL 2688423 (S.D. Ohio Sept. 12, 2007). Wogenstahl moved the district court to grant him a certificate of appealability ("COA"). The district court granted Wogenstahl a COA as to claims 1, 2(ii), 12(iv), 12(v), 12(ix), 14, 16, 22(iv), and 23, but denied him a COA as to claims 12(ii), 12(iii), 12(vi), 12(x), 12(xii), 12(xiii), 13(vi), 18, 21, and 27. Wogenstahl timely filed a notice of appeal. In 2009, our court granted Wogenstahl's motion to expand the COA to include claims 12(ii), 12(iii), 12(vi), 12(x), 12(xii), and 13(vi) as well as those originally granted by the district court.

## II.

Wogenstahl has grouped his claims before our court into six categories, and we follow his groupings. First, Wogenstahl argues that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence that prosecution witness Eric Horn had sold and used marijuana, and suborned perjury in presenting Horn's trial testimony that he had no involvement with marijuana (subclaim 2(ii)). Second, Wogenstahl contends that the prosecution violated his due process rights in the following ways: vouching for the credibility of state witnesses, denigrating defense counsel, confronting Wogenstahl, stating his personal opinion that Wogenstahl was lying, offering his personal opinions about the trial evidence, commenting on the defense's failure to call certain witnesses, and otherwise inflaming the passions and prejudices of the jury at both the guilty and penalty phases (subclaims 12(ii), (iii), (iv), (v), (vi), (ix), and (x) and 22(iv)). Wogenstahl also makes a claim of ineffective assistance of trial counsel (subclaim 12(xi)) based on counsel's failure to object to certain aspects of the prosecution's closing arguments and a claim that the trial court

erred in failing to rule on certain objections that were made (subclaim 12(xii)). Third, Wogenstahl argues that the prosecution engaged in misconduct by arguing that the nature and circumstances of the offense amounted to an aggravating circumstance that should be weighed against mitigating factors (claim 16). Fourth, Wogenstahl argues that his trial counsel performed ineffectively by telling the jury at the guilt phase that if he thought Wogenstahl had actually committed the offense, he would tell the jury to "put him in the [electric] chair" (subclaim 13(vi)). Fifth, Wogenstahl argues that his right to present a mitigation case was compromised by the trial court's denial of funds for a mitigation specialist and investigator (claim 1) and by trial counsel's ineffective assistance in preparing and presenting mitigation evidence at the penalty phase (claim 23). Sixth, Wogenstahl asserts that the trial court violated his rights by giving an "acquittal first" instruction that required the jury to unanimously vote for a life sentence (claim 14).

## III.

## A.

Because Wogenstahl filed his petition for writ of *habeas corpus* after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review *de novo* the district court's conclusions on issues of law and on mixed questions of law and fact and review its factual findings for clear error. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (*en banc*). Under AEDPA, our court will not grant a *habeas* petition on any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Montgomery*, 654 F.3d at 676 (internal quotation

marks omitted).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court's application of clearly established federal law to the facts of the prisoner's case was objectively unreasonable."  *Id.*

B.

The State argues that nearly all issues on appeal have been procedurally defaulted, and the district court concluded that several of the claims that remain at issue were procedurally defaulted. Thus, we set forth the general standard for determining whether an issue is procedurally defaulted at the outset.  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "A habeas petitioner procedurally defaults a claim if:

> (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default."

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (*en banc*); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The "cause" standard in procedural-default cases requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise a claim in the state courts.  *McCleskey v. Zant*, 499 US. 467, 493 (1991) (internal quotation marks omitted).  Such factors may include interference by officials, an attorney error rising to the level of ineffective assistance of counsel, or a showing of a factual or legal basis for a claim that was not reasonably available.  *Id.* at 493–94.  "[A] procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can

satisfy the 'cause and prejudice' standard with respect to the ineffective assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000).

Wogenstahl relies on his claim of IAAC to serve as "cause and prejudice" to excuse procedural default, while the State argues that Wogenstahl's IAAC claims are themselves procedurally defaulted. In this case, Wogenstahl first raised his IAAC claims in his initial Rule 26(B) motion to reopen, filed in 1996. This motion was dismissed for lack of jurisdiction pursuant to then-Ohio S. Ct. Prac. R. II(2)(D)(1). The Ohio Court of Appeals noted that Wogenstahl's IAAC claims should have been raised on direct appeal. On direct appeal of the original conviction to the Ohio Supreme Court, in response to Wogenstahl's claims of IATC and IAAC, the Ohio Supreme Court generally stated that it was "convinced that [Wogenstahl] received . . . competent representation both at trial and on appeal." *Wogenstahl*, 662 N.E.2d at 318. Although he originally faced a jurisdictional bar, due to the amendment of Ohio S. Ct. Prac. R.II(2)(D)(1), Wogenstahl was able to file a delayed Rule 26(B) application for reopening and did so in 1998. The Ohio Court of Appeals dismissed the motion and the Ohio Supreme Court affirmed for lack of good cause in filing an untimely delayed application (more than two years after the amendment to the Rule). *Wogenstahl*, 700 N.E.2d at 1255. Additionally, the courts found that they had previously determined that Wogenstahl's IAAC claims lacked merit and thus dismissed on grounds of *res judicata*. *Id.* The court, then, offered an alternative holding on the merits, but its conclusion rested on procedural grounds.

Since 1996, "Ohio law has provided sufficient guidance on what constitutes a 'good cause' for a late filing under Rule 26(B)," and "'the time constraints of Rule 26(B) [have been] firmly established and regularly followed.'" *Hoffner v. Bradshaw*, 622 F.3d 487, 504–05 (6th Cir. 2010) (quoting *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008)). Thus, Rule 26(B) is an adequate and independent ground on which to find procedural default. *Id.* at 505. Nonetheless, "[w]hen a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." *Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009). Thus, we conclude that Wogenstahl's IAAC claims were not necessarily procedurally defaulted

to the extent they were raised before the Ohio Supreme Court upon direct appeal.  We later consider whether any IAAC claims provide adequate "cause and prejudice" for default of Wogenstahl's other procedurally defaulted claims.[2] *See infra* Part. V.A.8.

IV.

Wogenstahl first contends that the prosecution violated his constitutional rights by withholding evidence that, prior to his 1993 trial, one of the key prosecution witnesses, Eric Horn, had been arrested for and adjudicated delinquent for trafficking marijuana.

A.

We  are required to afford AEDPA deference to the state courts' adjudication of Wogenstahl's *Brady* claim.  Wogenstahl argues that the district court erred in requiring him to return to state court to litigate this claim, given that the Horn evidence was not revealed until Wogenstahl had filed a federal *habeas* proceeding, and in the absence of an exhaustion requirement, we need not afford AEDPA deference.  Wogenstahl's argument is misplaced.

AEDPA preserves the Supreme Court's prior "total exhaustion" requirement. 28 U.S.C. § 2254(b)(1)(A); *see also Rhines v. Weber*, 544 U.S. 269, 274 (2005).  Some federal district courts have adopted a "stay-and-abeyance" procedure by which the district court will stay a petitioner's § 2254 proceeding and hold it in abeyance so that the petitioner can return to state court to exhaust his previously unexhausted claims without running afoul of the AEDPA's one-year limitations period.  *Rhines*, 544 U.S. at 275–76.  "Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.* at 277.  Wogenstahl had good cause for failing to raise the *Brady*

---

[2]The district court incorrectly suggests that in order to maintain an argument that there was cause and prejudice for default based in an IAAC claim, the IAAC claim must be independently pled in the *habeas* petition. *See Wogenstahl*, 2007 WL 2688423, at *62. *Edwards v. Carpenter*, cited by the district court, stands for the proposition that IAAC claims must be presented to the state courts and can themselves be procedurally defaulted, 529 U.S. 446, 452 (2000), not that they must be separately pled in federal court.

issue prior to 2003, because the new information about Horn was not disclosed until then. Thus, staying the district court *habeas* proceedings and holding them in abeyance while Wogenstahl pursued these claims in state court was proper. The timing of the state court's decision and the fact it was rendered while the *habeas* petition was stayed have no effect on our standard of review under AEDPA.

B.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "To assert a successful *Brady* claim, a habeas petitioner must show that: (1) evidence favorable to the petitioner, (2) was suppressed by the government, and (3) the petitioner suffered prejudice." *Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). "*Brady* requires that the prosecution disclose evidence that may impeach the credibility of a witness." *Wilson v. Parker*, 515 F.3d 682, 701 (6th Cir. 2008) (citing *Giglio v. United States*, 405 U.S. 150, 153–54 (1972)).

"Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the case would have been different." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 433–34 (6th Cir. 2008)). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'" *Id.* at 701–02 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "[T]he Brady standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome . . . ." *Montgomery*, 654 F.3d at 678.

Where the prosecution is shown to have suppressed *Brady* or *Giglio* matter relevant to its presentation of evidence known to be false, the "materiality" standard is less stringent. "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."

*Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009). "A conviction obtained by the knowing use of perjured testimony must be set aside 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.* at 583 (quoting *Giglio*, 405 U.S. at 154). Instead of asking, as under *Brady*, "whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different,'" a court addressing a *Giglio* false-testimony claim "ask[s] only 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* at 584 (citations omitted); *see Napue v. Illinois*, 360 U.S. 264, 272 (1959). The distinction in the two standards matters "because while a traditional *Brady* materiality analysis obviates a later harmless-error review under *Brecht v. Abrahamson*, [507 U.S. 619 (1993),] courts may excuse *Brady*/*Giglio* violations involving known and materially false statements as harmless error." *Rosencrantz*, 568 F.3d at 584 (footnotes omitted).

## C.

To reiterate the relevant facts, Horn testified at trial that Wogenstahl came to his mother's apartment at approximately 3 a.m. on November 24, 1991, where Horn was babysitting his younger siblings, and falsely told Horn that his mother, Peggy Garrett, needed to talk to him at Troy Beard's home three blocks away. According to Horn, Wogenstahl dropped him off on the street approximately one block away before they arrived at Beard's home but told him he would drive around the block and pick him up after he finished talking to his mother. When Horn arrived at Beard's residence, however, Garrett was not there, and Beard told Horn that he had not seen Garrett at all that evening. Further, when Horn went back outside, Wogenstahl did not return to pick him up. Horn walked back to his mother's apartment.

The next day police searched Wogenstahl's apartment and asked where he had been in the early morning hours of the previous day. Wogenstahl stated that he visited Horn at Garrett's apartment at approximately 3 a.m. and played a "practical joke" on Horn by dropping him off near Beard's apartment. Wogenstahl told police that he then went directly home to bed. Two days later, when interviewed again by investigators,

Wogenstahl changed his story; he said that he had driven Horn to the area of Beard's home because Horn wanted to deliver marijuana to Garrett. Wogenstahl maintained that he went directly home and to bed after this.

At trial, Wogenstahl testified in his own defense. Wogenstahl testified as follows: After he parted ways with Garrett and her friend, he followed them back into Harrison, where the two women pulled into Beard's apartment building. Garrett had told him that Horn was at her apartment, so at approximately 3 a.m. Wogenstahl decided to go to Garrett's home to "ask [Horn] if he would sell [Wogenstahl] a couple of joints." Wogenstahl had bought marijuana from Horn before. This time, Horn told Wogenstahl that he had no marijuana to sell him. Horn then asked Wogenstahl for a ride to Beard's apartment so Horn could give Garrett the marijuana he did have, which he had promised to her previously. At approximately 3:20 a.m., Wogenstahl agreed to give Horn a ride but declined to take him as far as Beard's apartment. Wogenstahl dropped Horn off approximately one block from that apartment and then returned to his own apartment.

When Horn was on the stand in the 1993 trial, Horn denied that he had ever seen marijuana around his house and that he had ever sold marijuana. In reality, Harrison police officers had executed a search warrant at Horn's home in August 1992 and found sixty-three grams of marijuana and $769 in Horn's wallet. Horn was charged with felony drug-trafficking and was later adjudicated delinquent for trafficking in marijuana. During a 2003 deposition regarding the prosecution's awareness of this evidence, Detective Ed Bettinger testified that he called Prosecuting Attorney Joe Deters at his home to tell him about Horn's adjudication. Bettinger was "sure" that he also discussed Horn's arrest with two other members of the prosecuting team, Piepmeier and Gibson. Similarly, police officer Steve Mathews testified during a deposition that Horn's arrest was discussed before trial at the prosecutor's office with Piepmeier, Gibson, or both. Subsequently, during a 2005 evidentiary hearing on Wogenstahl's § 2254 proceeding, Bettinger and Mathews gave testimony nearly identical to their depositions; Horn testified that he had pled guilty to the drug charge even though he was innocent and that

his testimony at Wogenstahl's trial was true; and prosecutors Deters, Piepmeier, and Gibson testified that they could not remember receiving information about Horn's arrest.

The *Brady* claim first surfaced in 2003 while Wogenstahl's petition for writ of *habeas corpus* was pending. The district court held the case in abeyance until Wogenstahl exhausted state remedies regarding newly discovered evidence. Wogenstahl then filed a motion for a new trial in state court on those grounds. The state trial court denied Wogenstahl's 2003 motion for a new trial based on the withheld evidence. The Ohio Court of Appeals affirmed, responding to Wogenstahl's two assignments of error. First, applying a six-part test from *State v. Petro*, 76 N.E.2d 370 (Ohio 1947), the Court of Appeals determined that there was no *Brady* error because "the new evidence does not present a strong probability that it would change the result if the new trial were granted." *Wogenstahl*, 2004 WL 2567655, at *4. The court specifically discussed the overwhelming evidence of guilt. *Id.* at *5. Second, in response to Wogenstahl's argument that he was entitled to a new trial because the prosecutors suborned perjury from Horn, the court hypothesized that if the information raised in the depositions were true, "there is no likelihood whatsoever that the new evidence of Horn's delinquency could have affected the jury's verdict." *Id.* at *7.

In addressing Wogenstahl's *Brady/Giglio* arguments, the district court quoted the state court's entire analysis. *Wogenstahl*, 2007 WL 2688423, at *32–36. The district court concluded that, although the withheld evidence was exculpatory, Wogenstahl was not prejudiced. *Id.* at *38. The district court found "[t]here was an enormous amount of evidence introduced at trial upon which a rational trier of fact could base a guilty verdict" and that Horn's "testimony did little more than provide a time line of the events." *Id.* at *38, 39. After detailing this evidence, the district court stated that "even if [] Wogenstahl had the information about [] Horn's adjudication and his counsel had been able to use that evidence to impeach [] Horn to the point where every juror found him to be completely incredible, there remained more than sufficient evidence to support a guilty verdict." *Id.* at 39. Furthermore, regarding Horn's argument that the prosecution suborned perjury, the district court found that because Horn's testimony was

not material to guilt or innocence, "Wogenstahl's conviction was not a result of such misconduct nor did it result in a violation of [] Wogenstahl's due process or fundamentally fair trial rights." *Id.*

D.

We affirm the decision of the district court. The state court decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented.[3]

Wogenstahl contends that the state court applied the wrong standard when it relied on the six-part test in *Petro* instead of *Brady*'s prejudice standard. We decline to address whether this constitutes error because the state court went on to find that "there is no likelihood whatsoever that the new evidence of Horn's delinquency could have affected the jury's verdict." This conclusion clearly adopted the less stringent *Giglio* standard with respect to materiality of evidence, whether or not the state court adequately addressed Wogenstahl's claim under *Brady*. Thus, the state court's conclusion that Wogenstahl was not prejudiced by the withheld evidence was neither contrary to nor involved an unreasonable application of clearly established federal law.

Wogenstahl further argues that the state court's determination of the facts was unreasonable in light of the evidence presented. We disagree and conclude that the

---

[3]The State contends that Horn's juvenile adjudication was inadmissible under Ohio law to impeach his credibility and thus did not qualify as *Brady* evidence. Post-trial information that is inadmissible under state law "is not 'evidence' at all" for purposes of *Brady* and thus can have no "direct effect on the outcome of a trial." *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995); *see also Saywer v. Hofbauer*, 299 F.3d 605, 614 (6th Cir. 2002). Nonetheless, such material could be material under *Brady* if it would "lead directly" to admissible evidence. *Sayer*, 299 F.3d at 614; *Hutchinson v. Bell*, 303 F.3d 720, 743 (6th Cir. 2002). At the same time, a federal court's conclusions that such inadmissible material would "lead" to admissible, exculpatory evidence cannot be based on "speculation with slight support." *Bartholomew*, 516 U.S. at 8.

Under Ohio's evidence rules, "[e]vidence of juvenile adjudications is not admissible except as provided by statute enacted by the General Assembly." Ohio R. Evid. 609(D); *see also* Ohio Rev. Code § 2151.357(H). "Where the submission of the juvenile adjudication is done merely to disclose that the adjudication exists in order to denigrate the juvenile's general credibility, the juvenile adjudication is inadmissible. *State v. Edwards*, No. 05AP-828, 2006 WL 3825252, at *3 (Ohio Ct. App. Dec. 29, 2006). However, "juvenile adjudications may be said to contradict or impeach specific testimony of a witness as opposed to a general attack on the [witness's] credibility." *Id.*; *see also State v. Cox*, 327 N.E.2d 639 (Ohio 1975). Because Horn's marijuana trafficking adjudication was directly relevant to Wogenstahl's account of his visit to Garrett's apartment, the adjudication was likely admissible under Ohio law.

effect of the new Horn evidence was minor because it remained undisputed that Wogenstahl went to Garrett's apartment in the middle of the night, left the apartment with Horn, and dropped Horn off on the street so Horn could visit Beard. Wogenstahl's own admissions, consistent with Horn's testimony, placed Wogenstahl in the area on the night Amber was abducted with knowledge that Horn would be absent and that no one would be watching Amber.

We recognize that had the jury been aware that Horn was lying about his history of marijuana trafficking, it might have been more willing to believe Wogenstahl's account of his visit. Horn's adjudication for marijuana trafficking lends credence to the idea that Wogenstahl went to the apartment to purchase marijuana. Furthermore, Horn's testimony implied that Wogenstahl had a deliberate plan to get Horn out of the apartment to leave Amber alone. Nonetheless, based on Wogenstahl's own first-account of the events of that night in his statement to police, he went to Garrett's apartment to play a "practical joke" on Horn. This account is fully consistent with the notion that Wogenstahl lured Horn from the apartment. Thus, we conclude that there is not a reasonable likelihood that the false testimony could have affected the judgment of the jury, either in convicting or sentencing Wogenstahl.

We affirm the decision of the district court with respect to Wogenstahl's *Brady/Giglio* claim.

## V.

Second, Wogenstahl argues that the prosecution made unconstitutionally improper closing arguments at both the guilt and penalty phases of his trial. Wogenstahl maintains that, during the guilt-phase argument, the prosecutor improperly vouched for the credibility of state witnesses, denigrated defense counsel, confronted and questioned Wogenstahl himself, stated his personal opinion that Wogenstahl was lying, offered his personal beliefs regarding significant facts, and improperly commented on his failure to call defense witnesses. Also, Wogenstahl contends that at both the guilt and penalty phases, the prosecution improperly inflamed the passions and prejudices of the jury. Grouped by Wogenstahl into this argument is an IATC claim based on his counsel's

failure to object to a number of alleged instances of prosecutorial misconduct.  Finally, as part of this overall grouping, Wogenstahl challenges the trial court's ruling on defense counsel's objections to improper prosecutorial arguments during closing arguments in both the guilt and penalty phases.

A.

Regarding procedural default of the prosecutorial misconduct claims that do not contain allegations of ineffective assistance of counsel, the district court concluded that Wogenstahl did raise the improper argument claim and the claims of inflaming jury passions at the guilt phase in his 1996 appeal to the Ohio Supreme Court, *see Wogenstahl*, 2007 WL 2688423, at *17,  and that the Ohio Supreme Court rejected these claims without analysis or comment, *id.* at *66.  The Ohio Supreme Court stated:

> We have repeatedly held that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal.  *See, e.g.*, *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528.  We adhere to that position today.  Several issues raised by this appellant have been addressed and rejected under similar circumstances in a number of our prior cases.  Moreover, a number of appellant's arguments have been waived.  Upon a careful review of the record and the governing law, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial.  *We are convinced that appellant received* a fair trial, a fair and reliable sentencing determination, and *competent representation both at trial and on appeal*.  We address, in opinion form, only those matters that merit some discussion.

*Wogenstahl*, 662 N.E.2d at 318 (emphases added).  The district court properly concluded that these claims were rejected without analysis or comment.  A claim is not procedurally defaulted unless the state court "actually enforced the state procedural sanction."  *Fautenberry v. Mitchell*, 515 F.3d 614, 633 (6th Cir. 2008) (internal quotation marks omitted).  Because the Ohio Supreme Court did not identify which of these issues it was addressing on the merits and which were waived, it is impossible to determine which claims were dismissed on the merits and which were dismissed due to procedural default.

We therefore presume that the prosecutorial misconduct claims, having been presented to the Ohio Supreme Court and denied, were adjudicated on the merits. *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011). And even though the state court's adjudication was by summary denial, our review is subject to the AEDPA deference requirements of 28 U.S.C. § 2254(d). *Id.* That is, *habeas* relief may be granted only if the state court's determination is found to be an unreasonable application of clearly established federal law. "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786.

"In the evaluation of a claim for prosecutorial misconduct, it is not enough that the prosecutor's comments were improper, but the relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009) (internal quotation marks and editorial marks omitted). We apply a "two-part test to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render [Wogenstahl's] trial fundamentally unfair." *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir. 2009). We first determine whether the prosecution's conduct was improper. *Id.* Second, we determine whether that improper conduct was flagrant by considering four factors: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* (internal quotation marks omitted).

1.

Wogenstahl argues that the prosecution improperly vouched for the credibility of state witnesses Bruce Wheeler, Kathy Roth, and F.B.I. Agent Doug Deedrick. "Improper vouching occurs when a prosecutor supports the credibility of a witness by

indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind that witness." *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008) (quoting *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)). "Generally, improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Francis*, 170 F.3d at 550 (internal citations omitted). "It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) (citing *United States v. Young*, 470 U.S. 1, 17–19 (1985)).

First, Wogenstahl cites a general instance of alleged vouching. When commenting on the witnesses who identified Wogenstahl or his car, or both, the prosecution stated: "They didn't lie and they are not mistaken. These people are honest people . . . . They are honest people who are just telling you what they know. You could believe them or you could believe this burglar, this robber, this thief who is in here before you today." Second, Wogenstahl points to a statement about witness Kathy Roth, who identified Wogenstahl as being near the area where Amber was found on the night she was murdered. The prosecution asked if Roth "show[ed] . . . any hesitation, . . . any doubt about that identification." The prosecution stated that Roth was certain, that she would not "make that kind of statement unless she was absolutely positive that she was right." Third, Wogenstahl mentions the prosecution's comments on the testimony of Bruce Wheeler, Wogenstahl's cellmate. The prosecution argued that the jury should believe Wheeler's testimony because he "got nothing for his appearance in th[e] courtroom" and because there is no other way Wheeler could have known the details of the crime without speaking to Wogenstahl. The prosecution stated that the jury should believe Wheeler "[b]ecause he was telling the truth." Fourth, Wogenstahl cites a comment regarding Agent Deedrick's expertise. The prosecution stated, "[D]uring the time that [Deedrick] testified I had to admit I have never seen a witness with as much expertise in a particular area that is knowledgeable on his subject matter as Special Agent Deedrick." Wogenstahl failed to object to any of these comments.

The statements regarding witness veracity verge on improper vouching because with these statements the prosecution "support[ed] the credibility of a witness by indicating a personal belief in the witness's credibility." *See Johnson*, 525 F.3d at 482. These statements of personal opinion are certainly problematic.[4]  Assuming that these statements were improper, "[a]n improper statement of personal belief, however, is not per se reversible error.  [We] must find that the improper statement was flagrant enough to 'warrant reversal.'"  *United States v. Henry*, 545 F.3d 367, 380 (6th Cir. 2008) (internal citation omitted).  "[A] state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence . . . ."  *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds as recognized by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000).  The prosecution's statements were made in the context of an extensive trial record.  The statement about the veracity of those who had identified Wogenstahl or his car and the statements about Roth and Wheeler were supported by evidence that had been presented in court and demonstrated no special knowledge of the prosecution.  Given that the evidence against Wogenstahl was strong, the comments were isolated, and the comments were unlikely to mislead the jury or prejudice Wogenstahl, we conclude that these statements were harmless.

The statements regarding Agent Deedrick's testimony even more precisely fit the description of improper vouching because they imply special knowledge of facts not in front of the jury—that is the prosecution's experience with other expert witnesses.  *See Johnson*, 525 F.3d at 482.  This statement, however, was isolated and, furthermore, supported by the record because Agent Deedrick himself testified to his qualifications and expertise.  Thus, this statement, although improper, was unlikely to mislead the jury or prejudice Wogenstahl.

After conducting an independent review of the record and law, we conclude that the state court decision is not contrary to or an unreasonable application of federal law.

---

[4] The statements about Roth do not appear to indicate any personal belief in her credibility, and we do not find them to be improper.  The State claims that Wogenstahl failed to exhaust his vouching allegation concerning Roth, but because we find that this statement was not improper, we need not address the issue of exhaustion.

The district court concluded that "the prosecutor's complained-of comments during his closing argument were not so egregious as to render [] Wogenstahl's trial fundamentally unfair," *Wogenstahl*, 2007 WL 2688423, at *69, and we agree.

2.

Wogenstahl argues that during closing argument the prosecution denigrated defense counsel. "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *Henry*, 545 F.3d at 377). The propriety of the prosecution's closing argument depends on the circumstances of the case and "what the defense has said or done (or likely will say or do)." *Id.* "[T]he prosecutor may not simply belittle the defense's witnesses or deride legitimate defenses . . . ." *Id.* "Of course, a prosecutor should not directly or implicitly impugn the integrity or institutional role of defense counsel." *United States v. Jamieson*, 427 F.3d 394, 414 (6th Cir. 2005).

Wogenstahl cites seven instances in which the prosecution allegedly denigrated defense counsel.[5]    These instances provide examples of the prosecution portraying

---

[5]Those instances are:

"What you've witnessed today in terms of the defense attorneys is a pretty common technique . . . . [W]hat we've seen today is the defense attorney throwing red pepper in your eyes continuously trying to confuse you and trying to throw something in your mind . . . not to mention the most ridiculous rendition of facts I have ever heard from the last three hours coming from the defense table."

"Now what is the purpose of these questions except to . . . throw this pepper in your eyes."

"You did notice that there were some incredible offensive comments by defense attorneys that we sat and listened to their summations and did not object."

"They are misleading you and attempting to mislead you."

"That is playing and lying with statistics."

"[Defense counsel] tried to get the doctor to say that [the blood spurted] and he said I have no idea but over a liter was left in her chest cavity. That was where the blood was."

"The defense talks about all these witnesses who didn't testify. They have every right . . . to subpoena any witness in the world . . . ."

defense counsel as attempting to mislead the jury and failing to present a complete case. Each of these instances was either a direct response to evidence presented at trial or a response to the defense counsel's closing arguments. Defense counsel, like the prosecution, is to avoid personal attacks on the prosecutor and "avoid acrimony in relations with opposing counsel during trial . . . ." *Young*, 470 U.S. at 10 (internal quotation marks omitted). In spite of this, defense counsel stridently suggested impropriety on the part of the prosecution.[6] Thus, the overall tone of the closing arguments was one of extremely zealous advocacy, accurately described as unpleasant. But, given this context, the cited statements of the prosecution's closing do not appear to denigrate defense counsel inappropriately.

The district court noted that "none of the comments about which [] Wogenstahl complains was an attack on the credibility or integrity of defense counsel," yet it continued its prosecutorial misconduct analysis and concluded that the factors weighed against Wogenstahl. *Wogenstahl*, 2007 WL 2688423, at * 70. We conclude that all of the instances cited by Wogenstahl were well within the prosecution's "wide latitude" to respond to the defense's case, *see Bedford*, 567 F.3d at 233, and thus find no improper prosecutorial conduct in closing argument.

3.

Wogenstahl challenges the prosecution's having directly confronted Wogenstahl during the guilt-phase closing statement. In the context of "calling out for justice" on behalf of Amber, the prosecution stated, presumably while looking at Wogenstahl: "I just want to ask you: Why did you do it and why did you have to kill that little girl who had not done anything to you?" Wogenstahl offers no case law to suggest that such a "calling out for justice" was improper. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) ("[I]ssues adverted to on appeal in a perfunctory manner unaccompanied by some effort at developed argument are deemed waived . . . ." (internal quotation

---

[6]One of the less egregious accusations is the following statement: "You're not going to buy snake oil and I think that is what they are trying to sell you is a little snake."

marks omitted.")).  He merely discredits the district court's deference to the decision of the Ohio Court of Appeals, which concluded:

> (1) the Ohio Supreme Court has said that there is nothing inherently wrong with a call for justice, *State v. Evans*, (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042; and (2) to the extent that the prosecutor may have inappropriately injected himself personally into the scenario drawn for the jurors, the error, if any, was neither prejudicial nor plain.

*Wogenstahl*, 1994 WL 686898, at \*13.  The district court went on to conclude that this claim is without merit because "of the isolated nature of the comment and the amount of evidence of [] Wogenstahl's guilt." *Wogenstahl*, 2007 WL 2688423, at \*71.  Because Wogenstahl fails to offer any argument as to why the prosecution's rhetorical question is improper, we conclude that the argument is without merit.

4.

Wogenstahl claims that the prosecution repeatedly called him a liar.  "In general, it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of the defendant." *Hall v. Vasbinder*, 563 F.3d 222, 235 (6th Cir. 2009) (internal quotation marks omitted).  However, "a prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony." *Francis*, 170 F.3d at 551.  "To avoid impropriety . . . such comments must reflect reasonable inferences from the evidence adduced at trial." *Id.* (internal quotation marks omitted).

Wogenstahl cites three specific instances within ten pages of one another in the trial transcript.  In one of the three instances, the prosecution mused about the type of person who would lie in court and then suggested that the kind of person who would lie in court is the kind of person who would do the things that eventually led to Amber's murder.  The next instance mentioned nothing about telling the truth or lying but rather discussed the "kind of guy" Wogenstahl was—"out on parole, lost his job, thrown out by his live-in girlfriend."  The third instance emphasized Wogenstahl's changing story:

"[Wogenstahl] changed his story repeatedly, he has lied to you, he has lied to the police . . . . Everybody is at fault and the FBI planted hairs and it wasn't my fault and they are lying if they said that and he blamed everybody but himself."

Wogenstahl does not dispute, however, that the prosecutor linked these instances to the evidence. These isolated comments were found within a larger discussion of Wogenstahl's credibility. In fact, throughout the ten pages prior to the ten pages with the arguably questionable statements, the prosecution discussed how the evidence presented at trial informs the determination of Wogenstahl's credibility. It is doubtful that these statements were improper and clear that they failed to prejudice Wogenstahl, as they were tied to the evidence presented at trial. The district court concluded that there was not prosecutorial misconduct because "the prosecutor was careful to tie his comments to the evidence that had been introduced." *Wogenstahl*, 2007 WL 2688423, at *71. We agree.

5.

Wogenstahl argues that the prosecution "vouched for and placed [its] imprimatur upon the credibility of the prosecution's entire case by speaking of personal, off record knowledge and facts and [its] opinion about those facts." Both prosecution and defense counsel are to "refrain from interjecting personal beliefs into the presentation of [the] case." *Young*, 470 U.S. at 8–9. The prosecution's

> vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Id.* at 18–19.

The allegedly objectionable statements resemble statements of personal opinion concerning Wogenstahl's guilt.  Wogenstahl argues that the following comment was improper: "You know, as I went through this case I found real foundations for these accusations that [] Wogenstahl committed these offenses."  We conclude that this statement is not improper because it suggests only that the trial evidence, not some special outside knowledge of the prosecutor, supported a guilty verdict.  Subsequent to making this statement the prosecution went into detail about that evidence.  Although counsel should have avoided the personal reference, this statement presents none of the concerns associated with the prosecution's having asserted personal beliefs as to the defendant's guilt.

Wogenstahl next references language from the prosecution's argument as to why Wogenstahl was at Garrett's apartment at all: "I know why he went there.  I know exactly why he went there.  You will see the results of why he went there when you go back into that jury room."  Wogenstahl also points out language in which the prosecution explained "the type of person who would lie in court."  These statements are more problematic as they are more likely to imply "that the prosecutor, by virtue of his experience, knowledge and intellect, has concluded that the jury must convict." *United States v. Bess*, 593 F.2d 749, 755 (6th Cir. 1979).  Certainly, the repeated prefacing of statements with "I know," "I believe," or "I think" is not preferable.  *See Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006).  Nonetheless, these statements were founded in evidentiary analysis, and, furthermore, they were isolated.  The district court concluded that these comments were not improper and there was no prosecutorial misconduct, *Wogenstahl* 2007 WL 2688423, at *72.  We conclude that these comments do not rise to the level of flagrancy required to constitute prosecutorial misconduct.

6.

Wogenstahl contends that the prosecution's comments regarding Wogenstahl's failure to call certain witnesses constitute prosecutorial misconduct. Wogenstahl's contention is based on the notion that these comments wrongly suggested that he had the burden of proving his innocence while in reality the prosecution had the burden of proving his guilt. "It is improper for the prosecutor to suggest that the defendant has the burden of proof or any obligation to produce evidence to prove his innocence." *Joseph*, 469 F.3d at 474 (editorial and internal quotation marks omitted). However, the trial court can diminish concerns of impropriety through jury instructions about burden of proof.

During the prosecution's closing rebuttal during the guilt phase of the trial, the prosecution stated:

> The defense talks about all these witnesses who didn't testify. They have every right, as we do, to subpoena any witness in the world . . . why didn't they subpoena him? It was irrelevant. It's totally irrelevant. If it was important to Wogenstahl's case they have the power to subpoena just like the State has.

Upon Wogenstahl's objection that "[w]e do not have to prove anything," the court spoke to the jury:

> The same instructions I will give you later and tell you again now. What counsel says in final argument is not evidence. The evidence that you will decide this case is what you hear from the witness box, and they can make reasonable inferences and you determine what the evidence is and you are to determine if they are making reasonable inferences.
>
> In addition, what they say to you in closing argument is not the law. What I say to you and what I instruct you on the law is the law.

Following the prosecution's guilt-phase rebuttal, the trial court gave instructions which included the following statements: "There is no necessity or requirement that any defendant present any evidence. The duty of proof rests entirely on the State of Ohio."

This instruction immediately following the prosecution's potentially improper comments as well as the final instructions assuage any concerns of misleading the jury. We conclude that, even if the prosecution's comments were improper, they were not flagrant.[7]

7.

Wogenstahl asserts that the prosecution wrongfully inflamed the passions and prejudices of the jury during closing argument at the guilt phase. Generally, "a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (internal quotation marks omitted). "Closing arguments that encourage juror identification with crime victims are improper." *Johnson*, 525 F.3d at 484. At the same time, "[n]othing prevents the government from appealing to the jurors' sense of justice or from connecting the point to the victims of the case." *Bedford*, 567 F.3d at 234 (internal citations omitted).

Wogenstahl objects to the following:

> Sometimes I feel like I could hear Amber. Sometimes I feel like I could hear her crying saying stop, please stop, saying help me. Sometimes I feel like I could honestly hear that voice.
>
> I just want to ask you: Why did you do it and why did you have to kill this little girl who had not done anything to you?
>
> You know what else I hear her doing? I hear her calling out for justice.

We acknowledge that these comments were improper. The pivotal question is whether they were so flagrant as to render the entire trial fundamentally unfair. Even if the comments about Amber were inappropriate and apparently deliberate, the remarks were isolated and trial evidence against Wogenstahl was substantial. *See Johnson*, 525 F.3d

---

[7]Furthermore, the prosecution's comments were a direct response to defense counsel's arguments that an absent witness "maybe . . . could enlighten us somewhat on [Wogenstahl's] behalf but they were not here to testify." Thus, the prosecutions's comments were likely proper as within the "wide latitude" of the prosecution to respond to the closing arguments of the defense. *Cf. United States v. Clark*, 982 F.2d 965, 969 (6th Cir. 1993) (concluding that the government's rebuttal did not imply a shift in the burden of proof on the defendant to prove his innocence but rather "[i]t was . . . [a] fair comment designed to meet the defense counsel's argument that the government omitted to call [a witness]").

at 485.  We conclude that, though these comments were likely improper, they were harmless.

8.

Wogenstahl also attacks comments made by the prosecution about Amber at the penalty phase as inflaming the passions and prejudices of the jury.  The district court ruled that this claim was procedurally defaulted based on the Ohio Supreme Court's application of the contemporaneous-objection rule.  *Wogenstahl*, 2007 WL 2688423, at *102.  Wogenstahl argues that he did indeed object to the comments in question by moving for a mistrial and, alternatively, that he had cause to excuse any default on the basis of IATC and IAAC.

During the prosecution's penalty phase closing argument a number of statements were made regarding Amber and the circumstances of her death.  Wogenstahl made no contemporaneous objection.  As soon as the prosecution's arguments concluded, Wogenstahl's counsel sought a mistrial, arguing that the "inflammatory remarks from the prosecutor about this little girl . . . did nothing but inflame the jury, . . . and we will ask for a mistrial . . . on the basis of his remarks."  The trial court denied the request for a mistrial.  In his direct appeal to the Ohio Supreme Court, Wogenstahl set forth the issue of prosecutorial misconduct in his Proposition of Law No. 28(G) entitled "Inflaming the Passions and Prejudices of the Jury."  In two separate propositions, Nos. 30 and 31, Wogenstahl generally raised the issues of IATC and IAAC claiming that trial counsel provided ineffective assistance by failing "to object during several instances of prosecutorial misconduct during final arguments at both the guilt-innocence and penalty phases of the trial" and that appellate counsel provided ineffective assistance by failing to raise many instances of IATC.

The Ohio Supreme Court rejected these prosecutorial misconduct challenges because "[Wogenstahl] never objected to the prosecutor's remarks at the time they were

made." *Wogenstahl*, 662 N.E.2d at 322.**8** The court found that "[Wogenstahl's] contentions of error based upon the state's initial closing argument [during the penalty phase] have been waived" because "'[i]mproper remarks of counsel during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to and exception taken; otherwise error cannot be predicated upon the remarks alleged to have been improper.'" *Id.* at 322 & n.2 (quoting *State v. DeNicola*, 126 N.E.2d 62, 63 (Ohio 1955)). In response to Wogenstahl's claims of IATC and IAAC, the Ohio Supreme Court generally stated that it was "convinced that [Wogenstahl] received . . . competent representation both at trial and on appeal." *Id.* at 318.

We agree with the district court that the Ohio Supreme Court's rejection of Wogenstahl's claim of prosecutorial misconduct at the penalty phase procedurally defaulted this claim for review by our court. During the prosecution's closing at the sentencing phase of trial, Wogenstahl's counsel failed to object to the allegedly inflammatory remarks of the prosecution regarding Amber's death. The Ohio Supreme Court enforced this rule by concluding that Wogenstahl's contentions on this claim had been waived. Failure to adhere to the "firmly-established Ohio contemporaneous objection rule" is "an independent and adequate state ground" of decision. *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006). And Wogenstahl has failed to show cause and prejudice excusing the default. *See Guilmette*, 624 F.3d at 290.

Wogenstahl's only argument rests in the fourth prong of the procedural-default test. He suggests that IATC demonstrates cause for his failure to object at trial. First, the state courts found that Wogenstahl's counsel, both at the trial and appellate levels, provided effective assistance. Second, Wogenstahl must show cause for procedural default based on IATC or IAAC, and such a cause showing must be based on deficient performance "so ineffective as to violate the Federal Constitution." *Edwards*, 529 U.S.

---

**8**Wogenstahl's objections to the prosecution's conduct in the penalty phase were raised on direct appeal in Proposition of Law No. 13. The Ohio Supreme Court explicitly addressed No. 13 and rejected it on procedural grounds. Wogenstahl's objections to the prosecution's conduct during the guilt-phase closing argument appear in Proposition of Law No. 28, which the Ohio Supreme Court did not specifically address as procedurally barred. Thus, although procedural default was not an issue with respect to the guilt-phase alleged misconduct, procedural default is relevant to the penalty-phase conduct.

at 451. Wogenstahl contends that his "trial counsel's ineffectiveness operates as 'cause.'" Yet, merely conclusory allegations of ineffective assistance like those Wogenstahl makes here, are insufficient to state a constitutional claim. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998).

We conclude that Wogenstahl's claim for prosecutorial misconduct during the penalty phase at trial regarding comments about the victim is procedurally defaulted based on the Ohio Supreme Court's ruling that it was waived.

9.

Viewing all of these claims cumulatively, we conclude that Wogenstahl's prosecutorial misconduct claims do not entitle him to *habeas* relief. A number of the prosecutor's comments were improper, although others were not. Nonetheless, the evidence against Wogenstahl was indeed overwhelming. Wogenstahl is unable to maintain a claim of prosecutorial misconduct, even cumulatively, without demonstrating flagrancy, and we conclude that he has failed to do so.

B.

Wogenstahl argues that trial counsel repeatedly performed ineffectively by failing to raise timely objections to "the prosecutor's constant stream of improper closing arguments." To establish ineffective assistance of trial counsel, Wogenstahl must show: (1) his counsel's performance was deficient—that it was objectively unreasonable under previous professional norms—and (2) it prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotations marks omitted). The test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

Wogenstahl maintains that under *Strickland* his prosecutorial misconduct claims demonstrate impropriety and it is "objectively unreasonable for effective counsel to sit silent in the face of these improper arguments." Yet, Wogenstahl's arguments remain conclusory and perfunctory, and we conclude that Wogenstahl's general claims of IATC are insufficient to overcome the presumption of reasonable professional assistance and are insufficient to warrant *habeas* relief.

## C.

Wogenstahl argues that trial counsel did indeed make some objections on which the trial court failed to rule. Specifically Wogenstahl alleges that the trial court erred in not ruling on his counsel's objections to improper prosecutorial arguments including: (1) argument that defense counsel could have called a particular witness; (2) argument at sentencing that defense counsel was there to justify what Wogenstahl had done; (3) argument at sentencing regarding Wogenstahl's unsworn statement (prosecutor stated that because Wogenstahl could not be asked any "tough questions . . . it had no weight"); and (4) argument regarding defense counsel's previously stricken statement that "If I thought he did it I will tell you to convict him and put him in the chair."

The district court concluded that the supposed failure of the trial court to rule on defense counsel's objections regarding the prosecution's remark about the calling of a witness was unimportant because the remark itself did not deprive Wogenstahl of a fair trial. We agree. The district court also concluded that Wogenstahl procedurally defaulted on his claims of error for failing to rule on the remainder of the arguments. Wogenstahl contends that he raised these claims on direct appeal to the Ohio Supreme Court, but his citations to his previously filed briefs before the Ohio courts do not demonstrate that he asserted that the trial court erred in failing to rule on his objections.

Thus, we affirm the ruling of the district court regarding Wogenstahl's claims of prosecutorial misconduct during trial and his related IATC claims.

VI.

Wogenstahl's third argument is also based on alleged prosecutorial misconduct. Wogenstahl argues that his due process rights "were violated by the prosecutor's improper mitigation phase closing argument which upended Ohio's capital sentencing scheme by arguing that the nature and circumstances of the offense were factors that weighed in favor of death." In essence, Wogenstahl argues that the prosecution argued the "nature and circumstances of the offense" as an aggravating factor, when Ohio law permits consideration of only those statutory aggravators that have been found by the jury to exist beyond a reasonable doubt at the guilt phase. Although we recognize the impropriety of many of the prosecutor's remarks, we conclude that this claim has been procedurally defaulted.

In this instance, Wogenstahl's trial counsel failed to raise an objection to the prosecutorial misconduct in question. Thus, Wogenstahl violated a procedural rule. On direct appeal, the Ohio Supreme Court concluded that because "[Wogenstahl] failed to raise an objection to any of the prosecutor's remarks concerning what constituted 'aggravation' in this case[,] . . . [Wogenstahl's] arguments based on the prosecutor's remarks have been waived." *Wogenstahl*, 662 N.E.2d at 324. As mentioned above when analyzing the claim that the prosecutor inflamed the passions of the jury, failure to adhere to the "firmly-established Ohio contemporaneous objection rule" is "an independent and adequate state ground" of decision. *Keith*, 455 F.3d at 673. Unlike its treatment of the claim regarding appealing to the passions of the jury, the Ohio Supreme Court, after it had concluded that Wogenstahl had procedurally defaulted, proceeded with its "discretionary review of [Wogenstahl's] contentions . . . under . . . plain error analysis . . . ." *Wogenstahl*, 662 N.E.2d at 324. Although the court did evaluate the claim under plain error, "the Ohio Supreme Court's plain error review does not constitute a waiver of the state's procedural default rules and resurrect the issue . . . ." *Keith*, 455 F.3d at 673. Thus, the Ohio Supreme Court's decision on direct appeal enforced procedural default on an independent and adequate state ground.

Absent cause and prejudice, we may not reach the merits of this claim. Wogenstahl argues that IATC serves as cause to excuse the default of failing to contemporaneously object at trial. To establish ineffective assistance of trial counsel, Wogenstahl must show deficient performance and prejudice. *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The test for prejudice is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "[E]stablishing *Strickland* prejudice . . . establishes prejudice for purposes of cause and prejudice" in the procedural default context. *Hall*, 563 F.3d at 237.

Although the Ohio Supreme Court did not grant Wogenstahl relief as to this claim, it issued criticism of the prosecution's repeated and detailed references to the nature and circumstances of the offense as "aggravation" or "aggravating circumstances." *Wogenstahl*, 662 N.E.2d at 322–25. The court concluded that the penalty-phase argument was "riddled with improper comments." *Id.* at 324. Nonetheless, the Ohio Supreme Court concluded that "the errors did not rise to the level of plain error." *Id.* "[T]he prosecutor's closing arguments . . . made no difference in the outcome of the trial, particularly in light of the statutory aggravating circumstances [Wogenstahl] was found guilty of committing and the lack of credible mitigating evidence [Wogenstahl] presented." *Id.* In addition, the court concluded that the trial court "properly instructed the jury that the only 'aggravating circumstances' at issue . . . were the three specifications of aggravating circumstances the jury had found [Wogenstahl] guilty of committing." *Id.* at 324–25.

The plain error standard in Ohio is similar to the standard for *Strickland* prejudice. The Ohio Supreme Court stated that "[p]lain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *Id.* at 322. Similarly, prejudice under a claim for IATC cannot be

established here. Even if we were to conclude that Wogenstahl's counsel was deficient in failing to object to the prosecution's statements (a conclusion we do not reach in view of the conclusory arguments made in Wogenstahl's brief in support of his *Strickland* claims), several factors favor a finding of a lack of prejudice necessary to establish both the *Strickland* claim and to overcome procedural default: (1) the judge's instruction that the attorneys' arguments do not constitute evidence; (2) the fact that "consideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution"; and (3) the fact that "the state appellate courts independently reweigh[ed] only the *relevant*, statutorily recognized aggravating circumstances against the mitigating factors and determine[d] death to be an appropriate sentence" makes the fact that the jury considered "an irrelevant, nonstatutory aggravating factor" not prejudicial. *See Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007) (internal quotations marks omitted).

Based on the Ohio Supreme Court's conclusions and our own evaluation of the record, we conclude that Wogenstahl is unable to establish *Strickland* prejudice and is thus unable to demonstrate cause and prejudice for the failure to object at trial. We conclude that Wogenstahl's claim was procedurally defaulted.

VII.

As his fourth major argument, Wogenstahl asserts IATC due to his trial counsel's "damaging arguments in closing," namely when he said: "If I thought he did it I will tell you convict him and put him in the chair." Wogenstahl raised this claim in his first Rule 26(B) motion and subsequent appeal of the denial of that motion to the Ohio Supreme Court. This motion, however, was dismissed on jurisdictional grounds pursuant to then-Ohio S. Ct. Prac. R. II(2)(D)(1), and, thus, the claims raised in it were procedurally defaulted unless raised upon direct appeal, which Wogenstahl failed to do. Wogenstahl incorporates his argument that IAAC meets the requirements of cause and prejudice under his claim that the prosecutor inflamed the passions of the jury. As stated above, Wogenstahl must show cause for procedural default based on IATC or IAAC, and such a cause showing must be based on deficient performance "so ineffective as to violate the

Federal Constitution." *Edwards*, 529 U.S. at 451. Merely conclusory allegations of ineffective assistance, however, like those Wogenstahl makes here, are insufficient to state a constitutional claim. *See Workman*, 178 F.3d at 771. Thus, we conclude that this claim has been procedurally defaulted as well.

Further, Wogenstahl's contention that he properly exhausted his substantive challenges to trial-court rulings on prosecutorial misconduct arguments as part of an Ohio R. App. 26(B) application reflects a fundamental misunderstanding about the limited relief available under Rule 26(B). Rule 26(B), *Murnahan*, motions are vehicles designed exclusively for raising claims alleging IAAC. *See* Ohio R. App. 26(B)(1) ("A defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of *appellate* counsel." (emphasis added)); *see also* Ohio Sup. Ct. Prac. R. 11.6; *Murnahan*, 584 N.E.2d at 1205. Wogenstahl's Rule 26(B) motions preserved for *habeas* review only his IAAC arguments, not the underlying substantive arguments. *See Lott v. Coyle*, 261 F.3d 594, 612 (6th Cir. 2001). The *Lott* court explained that permitting an Ohio prisoner to raise a substantive claim in a Rule 26(B) motion "would eviscerate the continued vitality of the procedural default rule; every procedural default could be avoided, and federal court merits review guaranteed, by claims that every act giving rise to every procedural default was the result of constitutionally ineffective counsel." *Id.* (internal quotation marks omitted).

## VIII.

Wogenstahl raises two claims regarding the mitigation phase of his trial as his fifth argument. First, he contends that the trial court committed prejudicial error by denying Wogenstahl's request for an investigator and mitigation expert. Second, he raises an IATC claim based on his trial counsel's failure to adequately investigate and prepare for the penalty phase and his trial counsel's deficient performance during the penalty phase.

A.

Wogenstahl argues that the trial court deprived him of his right to present a defense by refusing to authorize funds for a mitigation specialist and an independent psychology expert. "Indigent prisoners are constitutionally entitled to 'the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners.'" *Mason v. Mitchell*, 320 F.3d 604, 615 (6th Cir. 2003) (quoting *Britt v. N.C.*, 404 U.S. 226, 227 (1971)). "[M]ere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and . . . a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Okla.*, 470 U.S. 68, 77 (1985). "[W]hile the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system." *Id.* (internal quotation marks and citations omitted). Thus, the Court has identified "basic tools of an adequate defense. . . ." *Id.*

Wogenstahl asserts that, six weeks before trial began, his attorneys were informed by the trial court that they would be required to investigate the case on their own. He maintains that the damage caused by the absence of a mitigation investigator or specialist was borne out at the penalty phase by the demolition of much of his mitigation testimony on cross-examination, which could allegedly have been avoided through adequate preparation by a specialist. Observing that *Ake* held that the Due Process Clause requires funding for a psychiatric investigation for a defendant who had made a preliminary showing that his sanity was at issue, Wogenstahl argues that *Ake* extends to "expert assistance at the mitigation phase of a capital case." Wogenstahl also complains that the trial court appointed the county court's psychiatric clinic to assist the court rather than allowing the clinic to be appointed on Wogenstahl's behalf, which had the effect of denying Wogenstahl a confidential psychiatric examination.

On direct appeal, Wogenstahl raised his denial-of-funds claim as Proposition of Law No. 11 in the Ohio Supreme Court. The court gave this claim cursory treatment, but we view the claim as if it were denied on the merits, as the Ohio Court of Appeals did conduct a more detailed analysis of the claim, concluding as follows:

> In view of the nature of the defense, the extent of discovery, the trial court's order providing for the disclosure of all prosecution witness statements to the defense, and the court's willingness otherwise to provide mental-health services for mitigation through its psychiatric clinic, we cannot say that the denial of Wogenstahl's specific requests for assistance amounted to an abuse of discretion. Under the circumstances, we are convinced that the court acted appropriately in the absence of the requisite showing of reasonable need, and there is nothing in the record to indicate how its ruling might have compromised or prejudiced the actual preparation and presentation of Wogenstahl's defense. His fifth assignment of error is, accordingly, without merit.

*Wogenstahl*, 1994 WL 686898, at *4. When the last state court decision is silent or unexplained as to whether the decision was based on procedural default or denial on the merits, we "look through" that judgment to the "last reasoned judgment issued in the course of the petitioner's state appeals" to determine the basis of the decision. *Ivory v. Jackson*, 509 F.3d 284, 292 (6th Cir. 2007); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."). Thus, we will look through to the last reasoned decision, which was decided on the merits.

Wogenstahl contends that *Ake* should extend to his request for expert assistance in preparation for the mitigation phase. *Ake* itself does not mandate the appointment of a general mitigation expert or investigator for the penalty phase. Instead, if anything, case law places the burden of the mitigation investigation largely on the attorneys themselves. *See Fautenberry*, 515 F.3d at 645–46. Wogenstahl offers no other cases to support his proposition that the court should have provided him with additional funds for a mitigation specialist. Additionally, Wogenstahl has not explicitly quarreled with the trial court's rationale for denying his motion for funds for a mitigation investigator,

which was that one of his attorneys was a former investigator himself. Wogenstahl's claim is more aptly viewed as a claim for deficient performance of counsel. We conclude that he fails to establish that the court erred in denying him funds for a mitigation specialist.

In response to Wogenstahl's contention that he was entitled to an independent psychiatric expert, we have held that *Ake* does not entitle Wogenstahl to such an expert, only a "friend of the court" appointment. *Smith v. Mitchell*, 348 F.3d 177, 207–08 (6th Cir. 2003). *Ake* entitles Wogenstahl to a competent psychiatrist only, not a psychiatrist of his choosing. *Id.* at 208. Wogenstahl has failed to establish how the appointment of the county's expert was inadequate under *Ake*.

Thus we conclude that the state court reasonably concluded that the trial court did not abuse its discretion in denying Wogenstahl's requests for additional assistance.

## B.

Wogenstahl argues that his trial counsel failed to adequately investigate and prepare for the penalty phase hearing and performed deficiently at the penalty phase hearing.

Although Wogenstahl was represented by new counsel on direct appeal, Wogenstahl failed to raise his claim that his trial attorneys performed ineffectively by failing to prepare and present mitigation evidence. *See Wogenstahl*, 662 N.E.2d at 330–34 (listing Wogenstahl's propositions of law on direct appeal). Wogenstahl raised this claim for the first time in his postconviction application.[9] Noting that "*res judicata* is an appropriate basis for the dismissal of a postconviction claim alleging counsel's ineffectiveness at trial, when [Wogenstahl] was represented by new counsel on direct appeal and the issue could fairly have been determined without evidence dehors the record," the Ohio Court of Appeals held that Wogenstahl's "claims for relief assailing

---

[9]The recent Supreme Court decision, *Wellons v. Hall*, 130 S. Ct. 727 (2010), does not affect our analysis. In that case, the Court found that petitioner's claims were not barred from federal *habeas* review when the state supreme court rejected the claims on direct appeal and the state *habeas* court held that the claim had been previously decided on the merits and was thus barred by *res judicata*. In contrast, Wogenstahl's claim was never addressed on the merits and was dismissed only on procedural grounds.

trial counsel's performance were properly subject to dismissal . . . under the doctrine of *res judicata*." *Wogenstahl*, 1998 WL 306561, at *2.

Our court has repeatedly held that Ohio's *res judicata* rule is an adequate and independent state procedural ground for purposes of procedural default. *See Fautenberry*, 515 F.3d at 633. The first prong of the procedural default analysis, however, is whether "there is a state procedural rule that is applicable to the petitioner's claim and [whether] the petitioner failed to comply with the rule." *Id.* (internal quotation marks omitted). Our court has previously held that an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground. *See Durr v. Mitchell*, 487 F.3d 423, 434–35 (6th Cir. 2007); *Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007) (noting that our court has "declined to observe Ohio's procedural bar and instead [has] proceeded to the merits of an ineffective-assistance claim when we have concluded that Ohio improperly invoked its res judicata rule"). For our procedural default analysis, we must determine whether the state court correctly invoked its *res judicata* rule.

The Ohio *res judicata* rule prevents postconviction relief on "any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at trial*, which resulted in that judgment or conviction, *or on an appeal* from that judgment." *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982). "Generally, the introduction in a [postconviction relief] petition of evidence *dehors* the record of ineffective assistance of counsel is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*." *Id.* *Cole* noted, however, that, in the case before it, "the allegations outside the record upon which appellant relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence and, thus, to justify the trial court's application of the principles of *res judicata*." *Id.* Furthermore, Ohio courts have limited the evidence *dehors* exception as follows:

> Evidence presented outside the record must meet some threshold standard of cogency; otherwise it would be too easy to defeat the [*res judicata* rule] by simply attaching as exhibits evidence which is only

marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery. . . . To overcome the *res judicata* bar, evidence offered *dehors* the record must demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record.

*State v. Lawson*, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995) (internal editorial marks, quotation marks, and citations omitted). Furthermore, those decisions in which our court has addressed the merits of an IATC claim held by an Ohio appellate court to be *res judicata* usually involve claims that were based principally or primarily on evidence *dehors* the record. *See, e.g.*, *Hartman v. Bagley*, 492 F.3d 347, 357–58 (6th Cir. 2007).

The *dehors* evidence identified by Wogenstahl in his petition for postconviction relief included affidavits from two witnesses, Mabel Long and Edith Wilson, a daughter and mother who had been neighbors of the Wogehstahl family when Wogenstahl was growing up.[10] Long, who testified at trial, attested in her postconviction affidavit that she was ready to testify that Wogenstahl had been around her three young children "on numerous occasions" and that he "always acted in an appropriate manner" and was "kind and gentle toward them." She attested that Wogenstahl's attorneys, however, interviewed her for approximately two minutes and told her that she "was a character witness . . . not to say anything about [Wogenstahl's] relationship with her children." Wilson, Long's mother, did not testify at trial, but attested that she would have done so if asked by Wogenstahl's attorneys. She stated that she could have testified that Wogenstahl's mother verbally abused him and treated him poorly. Wogenstahl's claim on appeal before our court is based almost entirely on penalty-phase testimony and briefly refers to postconviction evidence relevant to trial counsel's performance with respect to the mitigation investigation.

Given the restrictions on the evidence *dehors* the record exception to Ohio's *res judicata* rule and given that Wogenstahl's IATC claim regarding mitigation evidence at

---

[10]The other *dehors* evidence cited by Wogenstahl was not produced until after he filed his § 2254 petition and consisted of deposition testimony by his trial attorneys and evidentiary hearing testimony by Long. This evidence does not inform our analysis of whether the state court applied its *res judicata* rule correctly as it could not have been factored into its analysis.

the state level relied nearly exclusively on evidence from the trial itself, we cannot conclude that the Ohio Court of Appeals improperly applied its *res judicata* rule to this claim. Wogenstahl does not argue cause to excuse his default. Thus, we conclude that this claim was procedurally defaulted.

IX.

As his sixth and final claim of error on appeal, Wogenstahl argues that the trial court gave an incorrect "acquittal first" jury instruction that suggested that the jurors had to be unanimous in acquitting on a death sentence before they considered life imprisonment.

> All twelve jurors must agree on a verdict. If all twelve members of the jury find, by proof beyond a reasonable doubt, that the aggravating circumstances which the defendant was found guilty of committing, outweigh the mitigating factors, then you must return such a finding to the Court, and as a matter of law, you would have no choice but to recommend to the Court that the sentence of death be ordered.
> . . . .
> On the other hand, if after considering all of the relevant evidence admitted at the two trials, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which of [*sic*] the defendant was found guilty of committing outweigh the mitigating factors, then you will return a verdict reflecting this decision. In this event, you will determine which of the two possible life imprisonment sentence [*sic*] to recommend to the court.

After several more pages of instructions and a sidebar between the court and counsel, the trial court stated: "And whenever all twelve, I repeat, all twelve of you agree on a verdict, you will execute the appropriate verdict form in ink and you will notify us using the buzzer." Wogenstahl's trial counsel made no objection to the jury instructions.

Wogenstahl did raise this claim on direct appeal to the Ohio Supreme Court in Proposition 30 under the umbrella of his IATC claims: "Failure to object to the trial court's instruction at the penalty phase that verdicts of the jury as to sentencing must be unanimous, and failure to request an instruction to the effect that, if the jury is unable to unanimously agree to impose the death sentence, then it must return a life verdict." The

Ohio Supreme Court appeared to rule on the merits of this IATC argument when it summarily concluded that it was "convinced that [Wogenstahl] received . . . competent representation both at trial and on appeal." *Wogenstahl*, 662 N.E.2d at 351.

Exhaustion of this IATC claim does not similarly exhaust the underlying substantive claim regarding the "acquittal-first" instruction. *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("[B]ringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because the two claims are analytically distinct.") (internal quotation marks omitted). Thus, Wogenstahl's raising of an IATC claim cannot be construed as having raised the substantive "acquittal-first" claim. *See id.* (concluding that a Rule 26(B) application was insufficient to raise the underlying substantive claim). Where a petitioner fails to exhaust his state remedies "and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would not find the claims procedurally barred[,] . . . there is a procedural default for the purposes of federal habeas . . . ." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). *But cf. White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005) (noting "that the exhaustion requirement is not a jurisdictional one" and thus our court exercised its "discretion not to reach the merits of the argument").

Again, our analysis of whether to address the merits of this claim rests in the fourth prong of the procedural default analysis. And again we observe that the state court found that Wogenstahl's counsel, both at the trial and appellate levels, provided effective assistance. Wogenstahl must show cause for procedural default based on IATC or IAAC, and such a cause showing must be based on deficient performance "so ineffective as to violate the Federal Constitution." *Edwards*, 529 U.S. at 451. Merely conclusory allegations of ineffective assistance, however, like those Wogenstahl makes here, are insufficient to state a constitutional claim. *See Workman*, 178 F.3d at 771.

Furthermore, even if we were to proceed to the merits of Wogenstahl's claim, he could not succeed. The Supreme Court has recently evaluated substantially identical penalty phase instructions in the face of "acquittal-first" challenges identical to

Wogenstahl's, and rejected them. *See Bobby v. Mitts*, 131 S. Ct. 1762 (2011) (*per curiam*); *Smith v. Spisak*, 130 S. Ct. 676 (2010). *Habeas* relief is therefore foreclosed. Moreover, Wogenstahl failed to object to the instructions given and failed to exhaust his substantive claim for relief.

The district court concluded that this claim was procedurally defaulted, and we agree.

X.

For the foregoing reasons, we affirm the district court's denial of Wogenstahl's petition for writ of *habeas corpus*.

———————————————

**CONCURRING IN JUDGMENT**

———————————————

KAREN NELSON MOORE, Circuit Judge, concurring in judgment.  I concur in the judgment that habeas corpus relief is unavailable to petitioner under the stringent AEDPA standards that currently apply.  I write separately to emphasize the breadth and depth of prosecutorial misconduct that occurred in this case.

The majority's summary of Wogenstahl's prosecutorial-misconduct arguments shows the scope of prosecutorial problems posed in the case.  As the majority recounts,

> Wogenstahl argues that the prosecution violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence that prosecution witness Eric Horn had sold and used marijuana, and suborned perjury in presenting Horn's trial testimony that he had no involvement with marijuana . . . . Second, Wogenstahl contends that the prosecution violated his due process rights in the following ways: vouching for the credibility of state witnesses, denigrating defense counsel, confronting Wogenstahl, stating his personal opinion that Wogenstahl was lying, offering his personal opinions about the trial evidence, commenting on the defense's failure to call certain witnesses, and otherwise inflaming the passions and prejudices of the jury at both the guilty and penalty phases.

Maj. Op. at 10.

I differ from the majority in that I would explicitly conclude that most of the prosecutorial action and commentary discussed in parts IV and V of the majority opinion were wholly improper.  The prosecution withheld *Brady* evidence, seemingly suborned perjury, improperly vouched for the credibility of state witnesses Wheeler and Deedrick, improperly denigrated defense counsel, improperly inflamed the jury with speculative commentary about the victim, improperly confronted and commented personally on petitioner, and improperly observed that the defense had failed to call witnesses.  Moreover, the Ohio Supreme Court recognized that the prosecutor's penalty-phase "closing argument was riddled with improper comments regarding the nature and

circumstances of the offense." *State v. Wogenstahl*, 662 N.E.2d 311, 324 (Ohio 1996). The prosecutorial misconduct here was plain and plentiful.

Nonetheless, I must concur in the judgment denying habeas relief because petitioner has not satisfied the AEDPA standard for showing that the decisions of the state courts on non-defaulted issues were contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d); *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011).