OPINION.
{¶ 1} In this death-penalty case, defendant-appellant Jeffrey Wogenstahl appeals the denial of his motion for a new trial. He claims that the prosecutors in the case withheld evidence and suborned perjury.
 {¶ 2} These are serious charges. They bear further investigation — but do not change the result in this case. We affirm the denial of a new trial, because even if Wogenstahl is correct, the alleged perjury would not have changed the result in his trial. But the prosecutors' conduct needs review by other authorities. There well may be an innocent explanation. We sincerely hope so.
 I. New Evidence in an Old Case {¶ 3} Anyone who has lived in Cincinnati long enough probably remembers the murder of ten-year-old Amber Garrett and the media attention it received more than a decade ago. Amber was taken from her home while she slept one November morning in 1991. Her body was found several days later in the woods near the side of a road in Indiana. Amber had lived with her mother, Peggy Garrett; her halfbrothers, Eric and Justin Horn; her brother, Matthew Garrett; and her half-sister, Shayna Perkins. (Justin was not home at the time and did not testify, so we refer to Eric as "Horn.")
 {¶ 4} Wogenstahl, an acquaintance of the family, had recently broken up with his girlfriend and had fallen on hard times. He knew the Garrett family and had stopped by one afternoon to see what Peggy was doing later that day. The two did not make any plans for the night. Later, Peggy decided to go out for the evening. She left Horn, then 16 years old, to watch Amber, Matthew, and Shayna, who were all sleeping in Peggy's room. Peggy did not actually tell Horn that all three children were at home — an oversight that would later delay the investigation.
 {¶ 5} Peggy saw Wogenstahl later at a local bar where they talked and had a few drinks. The two, along with Peggy's friend Lynn Williams, went outside and smoked marijuana in a car in the parking lot. They then went to another bar for a short time before driving back to get Wogenstahl's car. He asked if they wanted to come back to his apartment to smoke more marijuana, but the two women decided to go to the Waffle House instead.
 {¶ 6} What happened next is the question underlying this appeal. Horn testified that Wogenstahl came to the Garrett home shortly after 3:00 a.m. and told him that Peggy needed to talk to him at her friend Troy Beard's house. Horn did not have a key (he usually slept at his grandfather's trailer during the day — there was not enough room in the Garrett house for all the people to sleep at once), so the door was locked once he left. Wogenstahl then drove Horn part of the way to Beard's house and dropped him off. When confronted about this after Amber's disappearance, Wogenstahl claimed that he was just "messing with" Horn. As the case against him developed, Wogenstahl changed his story. According to the new story, Horn had asked to go to Beard's so that he could deliver some marijuana to Peggy.
 {¶ 7} Regardless of his motives, Wogenstahl drove Horn to a location a block or two away from Beard's apartment. Horn woke up a confused Beard, who said that Peggy had not been at his apartment. Horn then walked home to find the door ajar. He checked on the children. Seeing only Matthew and Shayna, he mistakenly assumed that Amber had spent the night at a friend's house. When he left at 5:00 a.m. to go to his grandfather's, he did not tell Peggy that Amber was missing.
 {¶ 8} Peggy later noticed that Amber was gone, but assumed she had taken the bus to church alone, as she often had done in the past. It seems that nobody realized anything was wrong until much later in the day, after the church bus had returned without Amber on it.
 {¶ 9} The local media and police put a lot of effort into the search for Amber. Several days passed. Eventually, an Indiana man heard news of the missing girl and remembered seeing a car stopped near his house the night that Amber disappeared. He called a police officer, who then discovered Amber's body down a hill in the brush off the side of the road.
 {¶ 10} The investigation quickly focused on Wogenstahl. He was charged with Amber's kidnapping and aggravated murder, as well as the aggravated burglary of the Garrett home.
 {¶ 11} The evidence at trial included testimony from witnesses who saw Wogenstahl or his car on the side of the road around 3:40 a.m., near where Amber's body was later found. Plant particles were found in Wogenstahl's leather jacket and shoes, and those particles were similar to blackberry bushes and other plant life found near Amber's body. The same leather jacket had been in good condition when Wogenstahl, Peggy, and Williams were out together; the next day, it was scratched as if it had been through a brushy area.
 {¶ 12} Blood was found in Wogenstahl's apartment and car. The blood in his car matched Amber's blood characteristics. Only one in 19 people would have had the same blood characteristics. And finally, Bruce Wheeler — an inmate who shared a pod with Wogenstahl in the county jail — testified that Wogenstahl had confessed the crimes to him. He gave details of the abduction and murder that were consistent with the other evidence that had already been presented in the case. The jury found Wogenstahl guilty of all the charges.
 II. The Problem {¶ 13} But apparently not everything was revealed during the 1993 trial. Horn apparently perjured himself during his testimony at trial.
 {¶ 14} Wogenstahl had claimed that Horn wanted a ride to deliver marijuana on the fateful night. Horn stated in a pretrial deposition and later at trial that he had never sold any drugs. But in August 1992, before the trial, Horn had been arrested and adjudicated as a delinquent for trafficking in marijuana. Wogenstahl claims that the prosecutors knew this but still allowed Horn to testify falsely.
 {¶ 15} Wogenstahl now argues that the prosecution intentionally withheld information about Horn's delinquency. He contends that the delinquency would have impeached Horn's credibility as a witness, and that the prosecutors intentionally suborned perjury from Horn during the trial. According to Wogenstahl, he should receive a new trial because of the prosecutors' misconduct and because he was denied due process. While the prosecutors' conduct is of great concern, Wogenstahl is mistaken in his assertion that these circumstances warrant a new trial.
 {¶ 16} The allegations that the prosecutors in this case intentionally withheld information and allowed perjured testimony from Horn at trial are very serious. If proved, the prosecutors' conduct violated the law and ethical rules. And it is something that disciplinary counsel for the Ohio Supreme Court should examine. But because of the standards by which we review his appeal, Wogenstahl has failed to show reversible error.
 III. More than a Decade of Appeals {¶ 17} In February 1993, a jury found Wogenstahl guilty of the kidnapping and aggravated murder of Amber Garrett, as well as aggravated burglary. It also found that Wogenstahl was guilty of three aggravating circumstances for the murder: that it was committed: (1) in the course of a kidnapping, (2) in the course of an aggravated burglary, and (3) to avoid detection and prosecution for the kidnapping and aggravated burglary. The jury also found Wogenstahl guilty of the priorconviction specifications for the kidnapping and aggravated burglary. Later, the same jury recommended a sentence of death for the aggravated murder; the trial court adopted the jury's recommendation.
 {¶ 18} This court affirmed the conviction,[1] as did the Ohio Supreme Court.[2] Wogenstahl petitioned for a writ of certiorari to the United State Supreme Court, but the petition was denied.[3]
 {¶ 19} In 1996, Wogenstahl petitioned for postconviction relief. The Ohio Supreme Court stayed his execution until he had exhausted his postconviction remedies. The trial court dismissed Wogenstahl's petition. We heard the appeal and affirmed the trial court's rulings;[4] the Ohio Supreme Court affirmed.[5]
 {¶ 20} Then in 1998, Wogenstahl moved for a new trial based on newly discovered evidence (different from what is in question in this case). The trial court denied his motion; we affirmed.[6] The Ohio Supreme Court then lifted the stay of execution.[7]
 {¶ 21} In 1999, Wogenstahl filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio. During the discovery phase of the federal action, Wogenstahl obtained police records that showed that Horn had been arrested and adjudicated delinquent in August 1992 — several months before he testified at Wogenstahl's trial that he had neither sold any marijuana nor seen any around his house. Wogenstahl also deposed members of the Harrison Police Department who testified that the then Hamilton County Prosecutor was aware of Horn's arrest and the delinquency adjudication. The depositions also showed that two assistant prosecutors might also have been aware of Horn's delinquency.
 {¶ 22} The federal district court decided to hold the case in abeyance until Wogenstahl had exhausted his state remedies regarding the newly discovered evidence. Wogenstahl then filed a motion for a new trial, which the trial court denied.
 {¶ 23} On appeal, Wogenstahl now assigns two errors: (1) the trial court should have granted his motion for a new trial because of newly discovered evidence of the prosecutors' withholding of evidence; and (2) the trial court should have granted his motion for a new trial because the prosecutors suborned perjury from Horn.
 IV. First Assignment of Error {¶ 24} In his first assignment, Wogenstahl argues that the trial court erred in denying his motion for a new trial based on newly discovered evidence — that Horn had been convicted of selling drugs and that the prosecutors had withheld evidence of Horn's arrest and prosecution for trafficking in marijuana.
 {¶ 25} The granting of a motion for a new trial based on newly discovered evidence lies within the trial court's discretion.[8] We will not disturb the trial court's decision unless the record demonstrates an abuse of that discretion.[9] To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment.[10]
 {¶ 26} It is a fundament of American jurisprudence that the accused has the right to examine any exculpatory and material evidence related to guilt or punishment.[11] Under Bradyv. Maryland,[12] the government must disclose any evidence favorable to the defense or detrimental to the government's own case. This may include impeachment and exculpatory evidence.[13] To establish a Brady violation, a defendant must show (1) the evidence at issue was favorable to the accused (including impeaching and exculpatory evidence); (2) the evidence was suppressed by the state either willfully or inadvertently; and (3) prejudice ensued.
 {¶ 27} A new trial may be granted upon a defendant's motion when new evidence material to his defense is discovered that could not with reasonable diligence have been discovered and produced at trial.[14] Failure to disclose the criminal record of a witness does not automatically warrant a new trial.[15]
 {¶ 28} In State v. Petro,[16] the Ohio Supreme Court set forth a six-part test for granting a new trial based on newly discovered evidence. The court held the following: "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."[17]
 {¶ 29} The evidence of Horn's drug arrest and delinquency adjudication undeniably contradicted his testimony at trial. We agree that the new evidence meets several of the Petro prongs. And it is arguable whether the new evidence is material to the issues and whether it merely impeaches or contradicts the former evidence.
 {¶ 30} But because the new evidence does not present a strong probability that it would change the result if a new trial were granted, we must affirm.
 V. Overwhelming Evidence of Guilt {¶ 31} The evidence in this case was overwhelming. Several witnesses saw Wogenstahl on the road at 3:40 a.m. the night of Amber's disappearance near where her body was later found. Experts from several crime laboratories identified plant material on Wogenstahl's jacket and shoes as being similar to that found around Amber's body. Wogenstahl's favorite leather jacket, which was in good condition earlier that night, was scratched as if it had been worn while walking through a wooded and brushy area similar to the one where Amber's body was found. A pubic hair was found in Amber's clothing that matched the characteristics of Wogenstahl's pubic hair. Police found evidence of blood in Wogenstahl's home and in his car. An expert testified that the blood from Wogenstahl's car matched Amber's blood to a degree that only about five percent of the population would have had the same blood characteristics. And Wheeler testified that Wogenstahl had told him the details of the crimes while they were both incarcerated in the Hamilton County jail.
 {¶ 32} Wogenstahl is correct that the new evidence tended to support his version of events. But it does not matter whether Wogenstahl lured Horn out of the Garrett household or whether he merely drove Horn to Beard's apartment for a drug delivery. Any way you look at it, the evidence overwhelmingly demonstrated that Wogenstahl was guilty of the kidnapping and murder of Amber Garrett. There is no probability — let alone a strong one — that the results of a new trial would be any different than the first. And no prejudice to Wogenstahl ensued — he would have been convicted either way.
 {¶ 33} None of the crimes or specifications of which Wogenstahl had been accused had anything to do with the reasons for taking Horn out of the Garrett household. Regardless of Horn's activities that night, Wogenstahl's crimes against Amber were the only actions that mattered when determining his guilt.
 {¶ 34} The trial court therefore did not abuse its discretion in denying Wogenstahl's motion for a new trial on the basis of newly discovered evidence. We overrule Wogenstahl's first assignment of error.
 VI. Second Assignment of Error {¶ 35} In his second assignment, Wogenstahl argues that the trial court should have granted his motion for a new trial because the prosecutors knowingly allowed Horn to testify falsely, and because they did not advise his trial counsel or the court of the false testimony. Wogenstahl has presented testimony that calls the prosecutors' conduct into question — but the prosecutors' actions do not undo his conviction.
 {¶ 36} The state may neither suborn perjury nor introduce testimony it knows or should know is false without correcting it.[18] A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the verdict of the jury.[19] That is, the law would require us to grant a new trial if there were any reasonable possibility that Horn's false testimony contributed to Wogenstahl's conviction.
 {¶ 37} At trial in 1993, Horn testified that he had never seen any marijuana around his house and had never sold it:
 {¶ 38} Q: And have you ever seen any marijuana around your house?
 {¶ 39} A: No.
 {¶ 40} Q: None at all?
 {¶ 41} A: No.
 {¶ 42} Q: Did you ever sell it?
 {¶ 43} A: No.
 {¶ 44} But in August of 1992, Harrison police officers had executed a search warrant at Horn's house and found 63 grams of marijuana in two separate plastic bags, a "bong," and $769 in Horn's wallet. Horn was later charged with felony drug trafficking, but the charge was reduced to a first-degree misdemeanor, and Horn was adjudicated delinquent for trafficking in marijuana.
 {¶ 45} Two members of the Harrison Police force — both of whom had testified at Wogenstahl's trial — testified in their depositions for his new-trial motion that the prosecutors in the murder trial had known about Horn's drug arrest.
 {¶ 46} In May 2003, Harrison Police Detective Ed Bettinger testified at a discovery deposition that he had notified the then Hamilton County Prosecutor about Horn's arrest:
 {¶ 47} Q: Now, a moment ago, you indicated that because of Eric Horn's involvement in the investigation of Amber Garrett, you would have been notified right away?
 {¶ 48} A: Well, I mean, I'm not talking instantly, but I was made aware, and as recollection serves me, it was at like 8:00 or 9:00 a.m. the next morning when I was told. * * *
 {¶ 49} Q: And you made the Hamilton County prosecutors aware of it?
 {¶ 50} A: Yes, I did.
 {¶ 51} Q: Do you know how soon after that?
 {¶ 52} A: Within an hour, and I can speak to that with some degree of certainty, because I know I called Joe Deters at his residence. I felt it was that significant.
 {¶ 53} Q: Did you talk to Mr. Piepmeier or Mr. Gibson [assistant prosecutors] about it?
 {¶ 54} A: I'm sure that there were conversations concerning it. As to whether I specifically notified them within a brief interval of finding it out, I don't recall that. I would have felt that in notifying their boss, I had fulfilled my obligation to make prosecution aware of it.
 {¶ 55} Q: Do you recall discussing it later on in preparation for the trial with Mr. Piepmeier or Mr. Gibson?
 {¶ 56} A: I'm sure. I'm sure that it was discussed, you know, what a turn of events this is, and that type of thing.
 {¶ 57} Later in the same deposition, Detective Bettinger went into greater detail about his conversation with the prosecutor:
 {¶ 58} Q: You stated earlier that when you first found out about the arrest of Eric Horn for drug trafficking in August of '92, you called Joe Deters at his residence?
 {¶ 59} A: Yes.
 {¶ 60} Q: Can you describe the content of that conversation?
 {¶ 61} A: More or less shock on both or our parts because Eric was a principal witness in this, and that was why I wanted to make him aware of this as soon as I could, you know, rather than waiting for business to resume Monday. I felt compelled to notify him at his residence, which is what I did.
 {¶ 62} Q: Do you recall any of the statements made by Mr. Deters at that time?
 {¶ 63} A: Oh, shit, you know, that was the —
 {¶ 64} Q: Okay.
 {¶ 65} A: You don't have to write that, do you? I mean, that was the general consensus, oh shit. I mean, what next.
 {¶ 66} Q: And you might have been asked this before, but did you have repeated or continued conversations with Mr. Deters about the impact of this arrest of Eric Horn on the Wogenstahl case?
 {¶ 67} A: I don't know how best to answer that, other than to reiterate. We had ongoing conversations with all the principals.
 {¶ 68} Wogenstahl also provided excerpts from the deposition of Harrison Police Officer Steve Mathews, who testified that he had known about Horn's arrest and had notified the prosecutors:
 {¶ 69} Q: Let me be clear, you're saying that before Jeffrey Wogenstahl's trial in early '93, you were aware of Eric Horn's drug trafficking arrest in August of '92?
 {¶ 70} A: I don't know that I knew the specific date, but I was aware of the arrest, yes.
 {¶ 71} Q: Do you recall discussing it with other members of the team that was investigating the Amber Garrett death?
 {¶ 72} A: Sure, with Lieutenant Bettinger, and again, I can't recall if it was both Piepmeier and Gibson or just Piepmeier or just Gibson. We were in one of their offices when this was brought up.
 {¶ 73} Q: And that was before trial?
 {¶ 74} A: And, again, I don't recall that I specifically said it. Lieutenant Bettinger was bringing it up. And when you say `before trial,' I'm not saying it was before the actual trial day. It could have been months or days or weeks beforehand. * * *
 {¶ 75} Q: And in terms of your preparation for testimony at trial, you indicate there was a meeting with either Prosecutor Piepmeier, Gibson or both, and there was discussion about Eric Horn's 1992 arrest?
 {¶ 76} A: Um-hum.
 {¶ 77} Q: Let me first ask you, where exactly did this take place?
 {¶ 78} A: It was at the prosecutor's office. I don't know whose office it was, but it was at the prosecutor's office. * * *
 {¶ 79} Q: And it's your recollection that it was Lieutenant Bettinger that brought it up with the prosecuting attorney?
 {¶ 80} A: Yeah.
 {¶ 81} Q: Do you remember what Lieutenant Bettinger said?
 {¶ 82} A: Generalized terms, it was that he was arrested for — from my recollection, generalized terms, he told him about the arrest of Eric Horn and the situation at hand.
 {¶ 83} It does not appear from the record that the prosecutors have responded to these charges — the state's brief does not comment on or deny the allegations. It simply states that they do not matter in the outcome of this case.
 {¶ 84} If the accounts contained in the depositions are true, they raise serious questions. But as they relate to Wogenstahl's conviction, we agree that these depositions do not change the outcome. As we have already stated, there is no likelihood whatsoever that the new evidence of Horn's delinquency could have affected the jury's verdict.
 {¶ 85} We therefore overrule Wogenstahl's second assignment of error. Accordingly, we affirm the trial court's judgment.
Judgment affirmed.
Doan, P.J., concurs.
Sundermann, J., concurs in judgment only.
[1] State v. Wogenstahl (Nov. 30, 1994), 1st Dist. No. C-930222.
[2] State v. Wogenstahl, 75 Ohio St.3d 344, 1996-Ohio-219,662 N.E.2d 311.
[3] Wogenstahl v. Ohio (1996), 519 U.S. 895, 117 S.Ct. 240.
[4] State v. Wogenstahl (June 12, 1998), 1st Dist. No. C-970238.
[5] State v. Wogenstahl, 83 Ohio St.3d 516, 1998-Ohio-587,700 N.E.2d 1254.
[6] State v. Wogenstahl (Feb. 19, 1999), 1st Dist. No. C-980175.
[7] State v. Wogenstahl (1999), 86 Ohio St.3d 1409,711 N.E.2d 692.
[8] State v. Williams (1975), 43 Ohio St.2d 88,330 N.E.2d 891.
[9] Id.
[10] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
[11] Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194.
[12] Id.
[13] Giglio v. United States (1972), 405 U.S. 150,92 S.Ct. 763.
[14] Crim.R. 33(A)(6).
[15] See State v. Kitzler (Feb. 1, 1996), 8th Dist. No. 69076.
[16] (1947), 148 Ohio St. 505, 76 N.E.2d 370.
[17] Id. at syllabus.
[18] See State v. Sanders, 92 Ohio St.3d 245, 2001-Ohio-189,750 N.E.2d 90, citing Mooney v. Holohan (1935), 294 U.S. 103,55 S.Ct. 340, and Napue v. Illinois (1959), 360 U.S. 264,79 S.Ct. 1173.
[19] See id.; Kyles v. Whitley (1995), 514 U.S. 419,115 S.Ct. 1555.