[Cite as *State v. Wogenstahl*, 2015-Ohio-5346.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140683 |
| | | TRIAL NO. B-9206287 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| JEFFREY A. WOGENSTAHL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 23, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Office of the Ohio Public Defender, Kimberly Rigby* and *Elizabeth Arrick*, Assistant State Public Defenders, for Defendant-Appellant.

**CUNNINGHAM, Presiding Judge.**

{¶1}  Defendant-appellant Jeffrey A. Wogenstahl appeals from the Hamilton County Common Pleas Court's judgment overruling his motion for leave to file a motion for a new trial.  We affirm the court's judgment.

{¶2}  In 1993, Wogenstahl was convicted upon jury verdicts finding him guilty of aggravated burglary, kidnapping, and aggravated murder for the abduction and death of ten-year-old Amber Garrett.  The aggravated-murder count charged that Wogenstahl had purposefully killed Amber while committing aggravated burglary and/or kidnapping.  And it was accompanied by three death specifications, alleging that he had killed her during an aggravated burglary, during a kidnapping, and for the purpose of escaping detection, apprehension, trial, or punishment for the aggravated burglary and/or kidnapping.  The jury also found Wogenstahl guilty of the three death specifications, and the trial court accepted the jury's recommendation and imposed for aggravated murder a sentence of death.

{¶3}  Wogenstahl unsuccessfully challenged his convictions in appeals to this court, the Ohio Supreme Court, and the United States Supreme Court, *State v. Wogenstahl*, 1st Dist. Hamilton No. C-930222, 1994 Ohio App. LEXIS 5321 (Nov. 30, 1994), *aff'd*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), *certiorari denied*, *Wogenstahl v. Ohio*, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996), and in postconviction proceedings filed in 1996, 1998, and 2003.  *State v. Wogenstahl*, 1st Dist. Hamilton No. C-970238, 1998 Ohio App. LEXIS 2567 (June 12, 1998); *State v. Wogenstahl*, 1st Dist. Hamilton No. C-980175, 1999 Ohio App. LEXIS 546 (Feb. 19, 1999); *State v. Wogenstahl*, 2004-Ohio-5994, 970 N.E.2d 447 (1st Dist.).  In 2007, the United States District Court for the Southern District of Ohio dismissed his petition for a writ of habeas corpus.  *Wogenstahl v. Mitchell*, S.D.Ohio No. 1:99-cv-

843, 2007 U.S. Dist. LEXIS 67388 (Sept. 12, 2007), *aff'd*, 668 F.3d 307 (6th Cir.2012), *certiorari denied*, 133 S.Ct. 311, 184 L.Ed.2d 185 (2012).

{¶4} In January 2014, Wogenstahl filed with the common pleas court a Crim.R. 33(B) motion for leave to move for a new trial and a Crim.R. 33(A)(6) motion for a new trial on the ground of newly discovered evidence. The court denied leave, and this appeal followed.

{¶5} On appeal, Wogenstahl presents two assignments of error, challenging the denial of both leave and a new trial. We hold that Wogenstahl should have been granted leave to move for a new trial, but that he was not prejudiced, because a new trial was not warranted.

### *The Trial*

{¶6} In the early morning hours of Sunday, November 24, 1991, ten-year-old Amber Garrett went missing from the apartment that she shared in Harrison, Ohio, with her mother, Peggy Garrett, and Peggy's four other children. Three days later, Amber's body was found in a wooded area off the side of a road in nearby West Harrison, Indiana.

{¶7} The investigation into Amber's disappearance focused, from the beginning, on Wogenstahl. He had recently experienced romantic and financial difficulties. Over the preceding month, he and Peggy had become acquainted, and he had come to know her family and had occasionally visited their apartment. While visiting with her on Saturday, November 23, Wogenstahl asked Peggy about her plans for the evening. She told him that she had no plans. But that night, between 11:00 p.m. and midnight, she left her 16-year-old son, Eric Horn, at home with Amber and the two youngest children and met a friend at a bar. From there, the two women drove to a second bar. Wogenstahl, clad in a brown leather jacket and jeans,

was at the bar and joined them for drinks. He learned from Peggy that her 15-year-old son, Justin, was away for the weekend, and that Eric was at home babysitting her younger children. Around 2:15 a.m., the three together drove to still another bar and then returned to the second bar, where Wogenstahl had left his car. Peggy and her friend left Wogenstahl there and drove to a restaurant.

{¶8} At approximately 3:00 a.m., Wogenstahl showed up at Peggy's apartment. Wogenstahl told Eric that Peggy needed to talk with him at a friend's apartment. Eric locked the apartment door and rode with Wogenstahl in the direction of the friend's apartment until, a block short of their destination, Wogenstahl dropped Eric off, with the promise that he would circle the block and return to drive him home. Eric found, when he got to the apartment, that Peggy was not there. And after waiting in vain for Wogenstahl to return, Eric walked home.

{¶9} When Eric returned to the apartment, he found the door open and Amber missing. Because Peggy had not told Eric that all three children were there that night, Eric assumed that Amber had spent the night at a friend's house and did not mention her absence to Peggy when she returned home.

{¶10} Peggy noticed Amber's absence later that morning, but assumed that Amber had taken the bus to church. By Sunday afternoon, when the church bus had returned without Amber on it, Peggy realized that Amber was missing. After Eric told her about Wogenstahl's 3:00 a.m. visit, Peggy and others went to Wogenstahl's apartment and banged on his door for over an hour until he answered. Asked to explain his actions with respect to Eric, Wogenstahl stated that he had been "messing with Eric's head," and that he had no idea where Amber was. That evening, he made a similar statement to the Harrison police.

{¶11} On Monday, November 25, the police investigation into Amber's disappearance intensified. A search of Wogenstahl's residence yielded nothing more than bloodstains in the bathroom that could not be identified as human, along with drugs and drug paraphernalia. An examination of a dumpster near Wogenstahl's apartment, where he had been seen on Sunday morning at approximately 5:15 a.m., also proved fruitless, because the dumpster had been emptied early Monday morning.

{¶12} During the search, the police again questioned Wogenstahl concerning his movements on Sunday morning. He stated that he had been playing a practical joke on Eric in luring him from his apartment and stranding him several blocks from home, and that he had gone home to bed after dropping Eric off. The police then asked him to accompany them to the station. He agreed and asked for his leather jacket from his bedroom closet. The officer who retrieved the jacket found that it was soaking wet, and that the lining was discolored. Wogenstahl explained that he had had to wash the jacket on Friday, November 22, because his cat had urinated on it earlier that evening.

{¶13} On Wednesday, November 27, Wogenstahl provided police with yet another statement. This time, he claimed that he had driven Eric to Peggy's friend's apartment to deliver marijuana to Peggy. But he again insisted that he had gone directly home to sleep after dropping Eric off.

{¶14} Wogenstahl owned a dark-brown four-door 1978 Oldsmobile Omega. At trial, several witnesses testified to seeing a car resembling Wogenstahl's car on the morning that Amber disappeared. A car resembling Wogenstahl's car was seen pulling into and then out of the parking lot of the restaurant where Peggy and her friend had gone after leaving Wogenstahl at the bar. At around 3:15 a.m., a

convenience-store clerk in Harrison saw a car resembling Wogenstahl's car drive past the store in the direction of Bright, Indiana. The clerk observed the silhouette of a man driving the vehicle, with what appeared to be a young girl in the passenger's seat. The same car returned between 3:45 and 4:00 a.m., parked at a car wash across the street from the store, and then moved to a distant corner of the convenience store's parking lot. The driver sat in the car for several minutes, causing the clerk to fear that she was about to be robbed. When the driver finally entered the store and purchased a pack of cigarettes, the clerk saw what appeared to be dirt or blood under the driver's fingernails. Later that morning, the clerk again saw the car parked across the street at the car wash, with a man inside cleaning the car's interior. The clerk later identified the car's driver as Wogenstahl.

{¶15} State's witness Harold Borgman lived on Jamison Road between Harrison, Ohio, and Bright, Indiana, in a rural area of West Harrison, Indiana, approximately four miles from Harrison, Ohio. On Wednesday, November 27, Borgman reported to police that, on Sunday morning, at 3:13 a.m., he had left his bed to use the bathroom and, on his way back to bed, had seen through his window a car proceed very slowly on Jamison Road in the direction of Harrison, pull to the side of the road, stop, and douse its headlights. Borgman continued to watch for several minutes as two or three other cars passed the parked car.

{¶16} Three people driving on Jamison Road toward Bright, Indiana, at approximately 3:40 that morning, testified at trial that they had seen a car resembling Wogenstahl's car parked on the side of the road near Borgman's house. One driver saw a man wearing a dark jacket and blue jeans taking something from the car's trunk. He later identified that man as Wogenstahl and the car as Wogenstahl's car. A second driver reported driving past a man wearing a brown

leather jacket and blue jeans standing near the car. The man had turned to face the driver, then dropped his head, and turned away. She later identified Wogenstahl as that man.

{¶17} On Wednesday, November 27, Borgman led the Indiana State Police to the location near his house where he had seen the car. Amber's body was found down a steep embankment off the side of Jamison Road. The area was heavily wooded and overgrown with thorny bushes and vegetation. The dress that Amber was wearing had been rolled up from behind and pulled down over her arms. She had sustained superficial knife wounds to the base of her neck, 11 stab wounds to her chest and neck, and a number of blunt-force injuries to her head that were consistent with having been administered with a car jack handle or some other blunt stick or rod. She also had postmortem scratches that indicated that she had been killed elsewhere and had then been carried through the area's dense vegetation to the spot where her body was found.

{¶18} A search of Wogenstahl's car revealed two car jacks, a ratchet jack and a screw or "scissors" jack. The metal handle for the screw jack was missing. Criminalists from the Hamilton County Coroner's Laboratory found the car to be exceptionally clean, as if it had been thoroughly washed. It bore no identifiable fingerprints. But a very small bloodstain was found inside the car. DNA was extracted from the bloodstain and was tested using the HLA DQ (Haldo) Alpha genetic-marker system. The HLA DQ Alpha classification of the blood was consistent with the HLA DQ Alpha classification of a known sample of Amber's blood. A forensic serologist testified at trial that Amber's HLA DQ Alpha classification occurred in approximately 5.3 percent of the Caucasian population, and

that the blood was not consistent with blood samples taken from Wogenstahl, Eric Horn, or Justin Horn.

{¶19} Criminalists found plant material, including thorn tips, on a pair of Wogenstahl's shoes and in small triangular tears in the leather jacket that Wogenstahl had been seen wearing on the morning Amber disappeared. That plant material was deemed by a trace-evidence expert to be similar to vegetation collected from the area where Amber's body had been discovered.

{¶20} Also, a single pubic hair was found in the crotch of Amber's underpants. Douglas W. Deedrick, a special agent assigned to the Hairs and Fibers Unit of the Scientific Section of the Federal Bureau of Investigation's Laboratory, conducted a microscopic comparison of that pubic hair to pubic-hair samples taken from Wogenstahl, Peggy Garrett, Eric Horn, and Justin Horn. In his report to the Harrison Police Department, Deedrick stated that the pubic hair found in Amber's underpants "exhibit[ed] the same microscopic characteristic as hairs found in the known pubic hair samples from [Wogenstahl]. Accordingly, this hair could have originated from [Wogenstahl]." At trial, Deedrick was asked to state his "opinion * * * to a reasonable degree of scientific certainty, where did that hair on the panties come from?" He responded, "It's reasonable for me to believe the hair did come from Jeffrey Wogenstahl [although] I cannot say positively."

{¶21} Finally, a fellow inmate at the Hamilton County Justice Center testified to the detailed account of Amber's abduction and murder that Wogenstahl had given him over the course of several conversations during their confinement together.

### *The Crim.R. 33 Motions*

{¶22}   Crim.R. 33(A)(6) permits a court to grant a new trial on the ground that "new evidence material to the defense [has been] discovered, which the defendant could not with reasonable diligence have discovered and produced at trial."  Crim.R. 33(B) requires that a Crim.R. 33(A)(6) motion be filed either within 120 days of the return of the verdict or within seven days after the court, upon "clear and convincing proof that the defendant [had been] unavoidably prevented from discovering the evidence" within the 120-day period, grants leave to file a new-trial motion out of time.

{¶23}   *"Newly discovered evidence."*   In support of his motions for leave and a new trial, Wogenstahl offered a copy of a letter dated August 20, 2013, from the United States Department of Justice ("DOJ") to the Hamilton County Prosecuting Attorney.  The letter advised the prosecuting attorney that the Federal Bureau of Investigation ("FBI") was in the process of reviewing microscopic-hair-comparison reports and testimony presented by FBI Laboratory examiners before December 31, 1999, when mitochondrial-DNA testing became routine.  The DOJ cautioned that the "subject of this review" was not "[t]he science underlying microscopic hair comparison," but rather those cases in which examiners had "exceeded the limits of [that] science by overstating the conclusions that may appropriately be drawn from a positive association between evidentiary hair and a known hair sample."  The purpose of the review was, therefore, to ensure that the reports and testimony "met accepted scientific standards and to identify those cases in which those standards were not met so that any appropriate remedial action may be taken."

{¶24} The DOJ went on to advise the prosecuting attorney that Wogenstahl's case had been identified as one in which the microscopic-hair-comparison testimony or report "included statements that exceeded the limits of science and were, therefore, invalid." And while "tak[ing] no position regarding the materiality of [the] error[s]" identified in Wogenstahl's case, the DOJ specified the nature of those errors and advised the prosecuting attorney concerning his next steps.

{¶25} Attached to the letter were the FBI's June 2013 report to the Innocence Project and its August 2013 report to the DOJ, showing the results of the review of Deedrick's lab report and testimony concerning the microscopic-hair-comparison analysis conducted in Wogenstahl's case. That review was conducted "in accordance with the November 9, 2012 agreed[-]upon scientific standards between the IP and FBI." From that review, the FBI concluded that Deedrick's lab report contained no "Inappropriate Statements" concerning the "Positive Association" result, and that the report included "Appropriate * * * Limitations Language" in the form of the statement that "[h]air comparisons do not constitute a basis for absolute personal identification." But the FBI found that Deedrick's trial testimony had included three types of statements that were "inappropriate" in that they "exceed[ed] the limits of the science" of microscopic-hair-comparison analysis.

{¶26} First, when asked for his "opinion * * * to a reasonable degree of scientific certainty" concerning the source of the hair on Amber's underpants, Deedrick responded, "It's reasonable for me to believe the hair did come from Jeffrey Wogenstahl." The FBI found that this testimony inappropriately "stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others." But the FBI also found that the testimony included limiting language, when Deedrick added, "I cannot say positively," and when he concurred

with the assistant prosecuting attorney's statement that he could not, "without comparing them all," "eliminate the possibility that [the hair] came from some other individual on the face of the earth."

{¶27} Second, when asked on cross-examination to explain the phrase "reasonable degree of scientific certainty," Deedrick responded,

> [S]cientific certainty is based upon experience of the individual, abilities of the person to discriminate one sample to the next. It's not absolute. Most of these are not absolute associations. It falls back to reasonableness. Is it reasonable based upon the experience what has been seen and what is visible that the two items are alike or they are different.

This statement, the FBI found, inappropriately "assigned to the positive association [between the hairs] a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association." Deedrick's inappropriate statement was again followed by limiting language, when he concurred with defense counsel's statement, "You can't point at [Wogenstahl] and say that's his hair definitely."

{¶28} Third, again on cross-examination, Deedrick testified that DNA-testing of hair might begin by the end of 1993. Defense counsel asked whether DNA-testing of hair, which "might give you one person of the population," would be "better than [the microscopic-hair-comparison analysis] you got now * * * [which might give you] two." Deedrick responded,

In case work you examine sample versus sample and many of the cases don't involve more than two or three known samples. It's not possible to take a hair from the very first case number one that I worked and then save it and compare it with case number four thousand and you see if it is like it or not.

But I have had a number of cases over the years where I have had more than a hundred samples and was able to eliminate all but one many times. I have never found yet in a case work where you could not distinguish between two known samples. That is the basis of the whole thing. If you look at one person's hair and look at another person's hair, if they look the same what is the sense of doing a hair exam. What I find is they are different and that's why I think you could do that.

The FBI found that Deedrick had, with this testimony, inappropriately "cite[d] the number of cases or hair analyses worked in the lab and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual."

{¶29} Finally, the FBI found that Deedrick had also provided on cross-examination one further statement providing limiting language. Asked about his conclusion in his report that the hair in Amber's underpants "could have originated from Jeffrey Wogenstahl," Deedrick agreed with defense counsel's statement that "hair comparisons do not constitute a basis for an absolute personal identification."

{¶30} *Leave to move for a new trial should have been granted.* More than 20 years after the verdicts were returned in his case, Wogenstahl sought a new trial under Crim.R. 33(A)(6), on the ground of newly discovered evidence. He

argued that "newly discovered evidence" contained in the DOJ correspondence demonstrated that he had been denied due process and a fair trial by "the prosecution's use of erroneous 'expert' testimony, regarding an invalid scientific analysis that removes the lynch-pin to the state's case against [him]."

{¶31} In seeking leave to move for a new trial out of time, Wogenstahl bore the burden of proving by clear and convincing evidence that, within 120 days of the return of the verdict in his case, he did not know of the existence of the proposed ground for a new trial, and that he could not, in the exercise of reasonable diligence, have learned of its existence. *See* Crim.R. 33(B); *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *State v. Hawkins*, 1st Dist. Hamilton No. C-110291, 2011-Ohio-5645, ¶ 14. We conclude that he sustained that burden.

{¶32} Ohio courts have, since the 1970s, admitted expert opinion testimony concerning the results of microscopic-hair-comparison analysis, provided that the examiner followed standard procedures and his testimony did not exceed the limits of that science. Thus, hair-comparison results may be used to exclude a person as a source of the hair. Or the examiner may testify that the evidentiary hair is "like," "similar to," or "consistent with" a known hair sample. But the examiner may not testify that the evidentiary hair is "identical to," "matches," or "is likely to be from the same source as" a known hair sample. *See State v. Biros*, 78 Ohio St.3d 426, 678 N.E.2d 891 (1997); *State v. Holt*, 17 Ohio St.2d 81, 246 N.E.2d 365 (1969); *State v. Bolser*, 1st Dist. Butler No. CA 79-04-0037, 1980 Ohio App. LEXIS 10665 (July 16, 1980).

{¶33} In its correspondence, the DOJ expressly disclaimed any intention to review the science underlying microscopic-hair-comparison analysis. Thus, it did not, as Wogenstahl asserted, conclude that microscopic-hair-comparison analysis

was an "invalid scientific analysis."  The correspondence instead suggests that a decade's experience with DNA testing had highlighted the limitations of microscopic-hair-comparison analysis and had, in 2012, prompted the DOJ, in cooperation with the Innocence Project, to settle upon "scientific standards" and to task the FBI with reviewing lab reports and testimony presented before the advent in 2000 of routine DNA testing, for the purpose of identifying "statements" that were "invalid" in the sense that they did not meet the "agreed[-]upon scientific standards."

{¶34} In turn, the express purpose of identifying those invalid statements was to allow "any appropriate remedial action [to be] taken."  Thus, the DOJ advised the prosecuting attorney's office that, with respect to a postconviction claim for relief based on an invalid statement identified in a federal case, the United States was, "in the interest of justice, * * * waiving reliance on the [relevant federal] statute of limitations * * * and any procedural-default defense in order to permit the resolution of legal claims arising from the erroneous presentation of microscopic hair examination laboratory reports or testimony."

{¶35} The DOJ's correspondence showed that the newly discovered evidence contained in that correspondence could not have been discovered within the time prescribed by Crim.R. 33(B).  We, therefore, hold that the common pleas court erred in denying Wogenstahl leave to move for a new trial based on that evidence.

{¶36} *No abuse of discretion in not granting a new trial.*  But we cannot say that Wogenstahl was prejudiced by the denial of leave.  Even if he had been afforded leave to move for a new trial, the record does not disclose a strong probability that the newly discovered evidence would change the outcome if a new trial were granted.

14

{¶37} The decision whether to grant a new trial is discretionary. *See State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891 (1975), paragraph two of the syllabus. A Crim.R. 33(A)(6) motion for a new trial on the ground of newly discovered evidence may be granted only if that evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶38} In support of his motion for a new trial, Wogenstahl argued that the newly discovered evidence contained in the DOJ correspondence "invalid[ated]" the science underlying microscopic-hair-comparison analysis and thus effectively "remove[d] the lynch-pin to the state's case against [him]." But, again, the DOJ expressly declined to disavow "the science" of microscopic-hair-comparison analysis. Moreover, the results of the FBI's review did not have the effect of "remov[ing] [from] the state's case" those statements in Deedrick's report and testimony that conformed with the scientific standards. Nor, on the record before us, can Deedrick's testimony and report concerning the hair evidence be said to have been the "lynch-pin to the state's case."

{¶39} We note that Wogenstahl supported his new-trial motion with not only the newly discovered evidence contained in the DOJ correspondence, but also the evidence that he had offered in support of his 2003 Crim.R. 33(B)(6) motion for a new trial. That evidence demonstrated that Eric Horn had perjured himself in a pretrial deposition and at trial, when he was asked about Wogenstahl's claim that they had gone to Peggy's friend's apartment to deliver marijuana, and he denied that

he had ever sold drugs. Wogenstahl later learned that, several months before his trial, Eric had been adjudicated delinquent for drug trafficking. Wogenstahl moved for a new trial on the grounds that the state had failed to disclose in discovery evidence material to Eric's credibility and had knowingly suborned his perjured testimony. The common pleas court overruled the new-trial motion, and we affirmed the court's judgment. We concluded that the newly discovered evidence of Eric's drug-dealing, while probative of his credibility concerning the reason for the 3:00 a.m. run to Peggy's friend's apartment, presented "no probability—let alone a strong one—that the results of a new trial would be any different," because the evidence adduced at trial "overwhelmingly demonstrated that Wogenstahl was guilty of [Amber's] kidnapping and murder." *Wogenstahl*, 2004-Ohio-5994, 970 N.E.2d 447, at ¶ 31-32.

{¶40} The evidence of Wogenstahl's guilt deemed "overwhelming[]" in our 2004 decision included Deedrick's testimony that the pubic hair found in Amber's underpants "matched the characteristics of Wogenstahl's pubic hair." *Id.* at ¶ 31. Even without that testimony, the evidence overwhelmingly demonstrates his guilt of aggravated burglary, kidnapping, and aggravated murder in Amber's abduction and murder. The evidence showed that, on the morning that Amber disappeared, Wogenstahl knew, from his conversation with Peggy at the bar, that her 16-year-old son was the only one home with Amber and her younger siblings. Regardless of the reason for the 3:00 a.m. run to Peggy's friend's apartment, Wogenstahl admitted in his statements to police that he had lured Eric from the apartment and had stranded him several blocks away. That morning, a number of witnesses saw Wogenstahl on the road near where Amber's body was later found. Wogenstahl's leather jacket, which had been in good condition when Peggy saw him at the bar, was later found by

law enforcement to be scratched and recently washed. Plant material on Wogenstahl's jacket and shoes was found to be similar to that found around Amber's body. Amber's blunt-force injuries were consistent with having been administered with a car jack handle, and the screw jack found in the trunk of Wogenstahl's car was missing its handle. Blood found in Wogenstahl's car was not his, but was consistent with Amber's blood to a degree that only about five percent of the population had the same blood characteristics. And Wogenstahl confessed his guilt to a fellow justice-center inmate. Therefore, we cannot say that there is a strong probability of a different result if a new trial were granted.

{¶41} Because the record does not disclose a strong probability that the newly discovered evidence would change the outcome if a new trial were granted, the common pleas court did not abuse its discretion in not granting Wogenstahl a new trial based on that evidence. Accordingly, we overrule the assignments of error and affirm the court's judgment.

Judgment affirmed.

DEWINE and STAUTBERG, JJ., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

17